Luann GEHIN, Petitioner-Respondent-Petitioner,

v.

WISCONSIN GROUP INSURANCE BOARD, Respondent-Appellant.

Supreme Court

*No. 03–0226. Oral argument September 9, 2004.—Decided February 23, 2005.*

2005 WI 16

(Also reported in 692 N.W.2d 572.)

For the petitioner-respondent-petitioner there were briefs by *Bruce F. Ehlke* and *Shneidman, Hawks & Ehlke, S.C.,* Madison, and oral argument by *Bruce F. Ehlke.*

For the respondent-appellant the cause was argued by *Charlotte Gibson,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. Luann Gehin, the claimant, seeks review of an unpublished decision of the court of appeals reversing an order of the Circuit Court for Dane County, Moria Krueger, Judge.[1] The circuit court had set aside the Wisconsin Group Insurance Board's termination of Luann Gehin's income continuation insurance benefits.

¶ 2. Relying on *Richardson v. Perales,* 402 U.S. 389 (1971), the court of appeals concluded that although the written medical reports the Group Insurance Board relied on were hearsay, they constituted substantial evidence upon which the Group Insurance Board could base its findings and decision.

¶ 3. The following issue is presented: Does uncorroborated written hearsay evidence alone (that is controverted by in-person testimony) constitute substantial evidence to support the Group Insurance Board's factual findings, which in turn form the basis for its conclusion of law, *i.e.,* that the claimant's benefits should be terminated as of April 30, 1997?

¶ 4. We conclude that the uncorroborated written hearsay medical reports alone (that are controverted by in-person testimony) did not constitute substantial evidence to support the Group Insurance Board's factual findings and decision to terminate the claimant's benefits. Accordingly, we reverse the decision of the court of appeals and affirm the order of the circuit court reversing the decision of the Group Insurance Board.

I

¶ 5. This court reviews the decision of the Group Insurance Board, not the circuit court's order or court

---

[1] *Gehin v. Wis. Group Ins. Bd.,* No. 03–0226, unpublished slip op. (Wis. Ct. App. Oct. 2, 2003).

of appeals' decision.[2] We review the decision of the Group Insurance Board to terminate the claimant's benefits pursuant to Wis. Stat. § 40.08(12) (2001–02),[3] which provides that decisions of the Wisconsin Group Insurance Board are "reviewable only by an action for certiorari in the circuit court for Dane County."[4]

¶ 6. In this certiorari review, the issue presented requires us to review the sufficiency of the evidence upon which the Group Insurance Board relied in reaching its decision.[5] The sufficiency of the evidence on certiorari review is identical to the substantial evidence

---

[2] This court "[does] not deal directly with the correctness of the court of appeals decision brought to us on review, nor do we owe that decision any deference." *West Bend Co. v. Labor & Indus. Review Comm'n,* 149 Wis. 2d 110, 117, 438 N.W.2d 823 (1989); *City of Oak Creek v. DNR,* 185 Wis. 2d 424, 446, 518 N.W.2d 276 (Ct. App. 1994).

[3] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[4] Wisconsin Stat. § 40.08(12) provides as follows:

Notwithstanding s. 227.52, any action, decision or determination of the board, the Wisconsin retirement board, the teachers retirement board, the group insurance board or the deferred compensation board in an administrative proceeding shall be reviewable only by an action for certiorari in the circuit court for Dane County that is commenced by any party to the administrative proceeding, including the department, within 30 days after the date on which notice of the action, decision or determination is mailed to that party, and any party to the certiorari proceedings may appeal the decision of that court.

[5] In a certiorari review, the scope of review is generally limited to whether the agency (1) kept within its jurisdiction; (2) proceeded on the correct theory of law; (3) was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; or (4) might reasonably have made the order or finding based on the evidence. *Kraus v. City of Waukesha Police*

test used for the review of administrative determinations under chapter 227 of the statutes.[6]

¶ 7. Wisconsin Stat. § 227.57(6) provides that "the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency's action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence."[7] This case involves the meaning of the words "substantial evidence," as used in § 227.57(6).

& *Fire Comm'n,* 2003 WI 51, ¶ 10, 261 Wis. 2d 485, 662 N.W.2d 294; *Schmidt v. Wis. Employe Trust Funds Bd.,* 153 Wis. 2d 35, 40, 449 N.W.2d 268 (1990).

The issue of the sufficiency of the evidence falls within the third and fourth standards. *State ex rel. Harris v. Annuity & Pension Bd.,* 87 Wis. 2d 646, 652, 275 N.W.2d 668 (1979).

[6] *Harris,* 87 Wis. 2d at 652; *Stacy v. Ashland County Dep't of Pub. Welfare,* 39 Wis. 2d 595, 602, 159 N.W.2d 630 (1969); *Teriaca v. Milwaukee Employees' Ret. Sys./Annuity & Pension Bd.,* 2003 WI App 145, ¶ 30, 265 Wis. 2d 829, 667 N.W.2d 791.

[7] Wisconsin Stat. § 227.57(6) reads as follows:

If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not support by substantial evidence in the record.

Wisconsin Stat. § 227.57(5) provides:

The court shall set aside or modify the agency action if it finds that the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action, or it shall remand the case to the agency for further action under a correct interpretation of the provision of law.

¶ 8. To determine whether substantial evidence supports the Group Insurance Board's factual findings and decision to terminate the claimant's benefits, we shall first examine the Group Insurance Board's findings of fact. We next review the evidence upon which the Group Insurance Board relied in its findings of fact. We then explore the legal basis for the long-standing rule adopted in *Folding Furniture Works, Inc. v. Wisconsin Labor Relations Board,* 232 Wis. 170, 189, 285 N.W. 851 (1939), that uncorroborated hearsay evidence alone does not constitute substantial evidence. Upon analyzing the hearsay evidence and live testimony, we conclude that we should not deviate in the instant case from the long-standing rule in Wisconsin that uncorroborated hearsay alone does not constitute substantial evidence. Finally, we examine and do not accept the Group Insurance Board's arguments, based on *Richardson v. Perales,* 402 U.S. 389 (1971), that we should abandon the rule long used in this state that uncorroborated hearsay evidence alone does not constitute substantial evidence.

## II

¶ 9. In order to test whether the Group Insurance Board's findings of fact and conclusions of law are supported by the substantial evidence, we first state the Group Insurance Board's "Findings of Fact" set forth in its April 16, 2002, Final Decision and Order. We then examine the record for evidence supporting these findings of fact.

¶ 10. The critical findings of fact in the present case relate to the nature and extent of the claimant's disability, the claimant's ability to work full time and the claimant's ability to earn at least $979.37 per

month.[8] The nature and extent of disability and the ability to work full time may be the subject of expert opinion.[9]

¶ 11. The Group Insurance Board's findings of fact are as follows.

¶ 12. The claimant began work at University of Wisconsin Hospital in Madison, Wisconsin, in 1986[10] and began regular, full-time employment as a housekeeper in 1991.[11] On May 15, 1992, the claimant injured her back at work at the hospital.[12] Due to gradually worsening pain, the claimant went on medical leave 11 days later; her last day of work at the hospital was April 16, 1993.[13]

¶ 13. The claimant filed a claim form to collect long-term income continuation benefits in April 1993.[14] Long-term income continuation insurance benefits are paid after the first year of a claimant's disability.[15] The

---

[8] Finding of Fact #15 calculates what the claimant would have had to earn in this case: "The record appears to indicate that Ms. Gehin's gross ICI benefits at the time those benefits were terminated were $979.37 per month. Therefore, in order to be considered gainfully employed for purposes of section 5.14 – 4.b. of the ICI contract, she would have to be capable of earning $979.37 per month, or $5.63 per hour in a full-time position."

[9] *Giant Grip Mfg. Co. v. Indus. Comm'n,* 271 Wis. 583, 585, 74 N.W.2d 182 (1956).

[10] Finding of Fact #4.

[11] *Id.*

[12] Finding of Fact #5.

[13] *Id.*

[14] Finding of Fact #6.

[15] Finding of Fact #14.

claimant had income continuation insurance coverage at all times material during her appeal.[16]

¶ 14. Claimants may receive benefits "if by reason of any medically determinable physical or mental impairment" they are unable "to engage in any substantial gainful activity for which the employee is reasonably qualified with due regard to the employee's education, training and experience, and prior economic status."[17] An activity is considered a substantial gainful activity if the earnings from the activity would be at least equal to the income continuation benefits at the time those benefits were terminated.[18] (In its Final Decision and Order the Group Insurance Board sometimes refers to satisfying the contractual phrase "inability to engage in a substantial gainful activity" as "totally disabled.")[19]

¶ 15. According to the Group Insurance Board's findings, to be considered "gainfully employed" under the contract, the claimant in the instant case "would

---

[16] Finding of Fact #6.

[17] Finding of Fact #14.

[18] The claimant must meet the contractual definition of "substantial gainful activity" provided in Section 5.14–4.b of the contract, which states as follows:

> After the first 12 months, the EMPLOYE's complete inability by reason of any medically determinable, physical or mental impairment, to engage in any substantial gainful activity for which the EMPLOYE is reasonably qualified with due regard to the EMPLOYE's education, training, experience, and prior economic status. An activity is considered a substantial gainful activity if the earnings from that activity would be at least equal to the gross Income Continuation benefit for the same period of time.

Finding of Fact #14.

[19] *See, e.g.,* Conclusion of Law #16.

have to be capable of earning $979.37 per month, or $5.63 per hour in a full-time position."[20]

¶ 16. The United Wisconsin Group, the company then in charge of administering the income continuation insurance program, determined that the claimant's disability began on May 3, 1993, and approved her for income continuation insurance benefits in June 1993.[21]

¶ 17. In late September 1993, Dr. John Whiffen performed spinal fusion surgery on the claimant's back.[22] From the following September through spring 1997, the claimant was "involved in a job retraining program through the State of Wisconsin Division of Vocational Rehabilitation."[23] Vocational Rehabilitation assigned the claimant, on an unpaid basis, to the Mendota Mental Health Institute in Madison, where, according to a letter from the Institute, her duties included "typing on both a typewriter and a computer, filing, answering the telephone and other clerical duties."[24] Due to pain and fatigue, the claimant fell short of the scheduled 40 hours per week, and according to the Group Insurance Board's finding, "generally worked between 24 and 30 hours per week . . . ."[25] Nevertheless, the claimant received a positive job performance assessment.[26] In referring to this report, the Group Insurance Board accepted that in her only job experience since being injured, she was not able to work full time.

---

[20] Finding of Fact #15.

[21] Finding of Fact #6.

[22] Finding of Fact #5.

[23] Finding of Fact #7.

[24] Finding of Fact #7.

[25] *Id.*

[26] *Id.*

¶ 18. At the request of United Wisconsin Group, Dr. Whiffen provided a written update of the claimant's condition as of January 30, 1997.[27] Dr. Whiffen's February 7, 1997, written update concluded that the claimant "could work up to full-time with restrictions, including a need to change position every 45–60 minutes for five minutes."[28] Then on March 11, 1997, Dr. Whiffen stated that the claimant could return to her former job, with restrictions.[29] It is not clear from the record whether the "former job" was the claimant's job training program at Mendota Mental Health Institute or her work as a housekeeper at the University.

¶ 19. In early May 1997, United Wisconsin Group determined that the claimant no longer met the criteria for benefits under the applicable section of the contract.[30] Specifically, United Wisconsin Group wrote to the claimant, "The medical documentation that we have obtained does not support that you are incapable of engaging in any gainful occupation. Information from DVR [Division of Vocational Rehabilitation] indicates that you have been performing in a full time position at Mendota Health Institute. Therefore, benefits beyond April 30, 1997 are not payable."[31] (This statement is not correct. According to the Finding of Fact #7 and the Mendota Mental Health Institute, the claimant was not performing in a full-time position at the Institute.)

¶ 20. In mid-August 1997 the claimant saw Meriter Hospital physical therapist Michael Miller.[32] Mr.

---

[27] Finding of Fact #10.

[28] *Id.*

[29] *Id.*

[30] Finding of Fact #8.

[31] *Id.*

[32] Finding of Fact #12.

Miller conducted a functional capacity evaluation and "concluded that '[b]ased on the client's lack of ability to squat, lift, stand, walk and carry anything but negligible loads, she does not appear employable in her current condition.' "[33] The Group Insurance Board discounted and disparaged Mr. Miller's evaluation, stating that "it does not appear from the record that Mr. Miller had the benefit of the contract definition."[34] The following month, United Wisconsin Group asked Dr. Kenneth Redlin to review the claimant's files, including Miller's report.[35]

¶ 21. The claimant asked United Wisconsin Group to reconsider its termination decision,[36] and on December 3, 1997, Dr. Richard Lemon saw the claimant.[37] Unlike Mr. Miller, Dr. Lemon had available, according to the Group Insurance Board, the contractual language defining "substantial gainful activity." The Group Insurance Board concluded that "Dr. Lemon concluded that [the claimant] did not meet the contractual long-term benefit definition," quoting Dr. Lemon's report as follows:

> Because of [low back pain] symptoms I believe that Ms. Gehin needs to be under permanent work restrictions. I believe that she is capable of working 8 hours a day where she can alternate between sitting and standing every 30 minutes. I believe that she needs to be lifting no more than 5 pounds. She also needs to avoid any stooping, bending or twisting. I believe that Ms. Gehin could easily be employed in a position such as a receptionist where she is able to stand or sit using a

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Finding of Fact #8.
[37] Finding of Fact #11.

telephone headset for comfort. Certainly, Ms. Gehin could also do some light paperwork or computer work. I find it hard to believe that Ms. Gehin at only 53 years of age is totally unemployable.[38]

¶ 22. In quoting Dr. Lemon's report the Wisconsin Group Insurance Board obviously accepted Dr. Lemon's expert medical opinion that the claimant was permanently disabled and that she could work full time with permanent work restrictions, namely that she must alternate between sitting and standing every 30 minutes; that she may lift no more than 5 pounds; that she must avoid stooping, bending or twisting; that that she was capable of grasping, fine manipulation, firm grasping and use of her feet for intermittent repetitive movements.

¶ 23. On January 6, 1998, United Wisconsin Group upheld its termination of the claimant's benefits.[39]

¶ 24. A month later, the claimant asked the Department of Employee Trust Funds to review the termination of her benefits.[40] On July 9, 1998, the Department affirmed the termination of benefits, and the claimant timely appealed.

---

[38] *Id.*

[39] Finding of Fact #8.

The Department of Employee Trust Funds and the Wisconsin Group Insurance Board (which is attached to the Department of Employee Trust Funds) are charged with administering the income continuation insurance plan. Wis. Stat. §§ 40.03(2)(ig), 40.03(6)(a)1, 40.62(1). *See also State – Income Continuation Insurance Fact Sheet 2004* (available online at http://etf.wi.gov/publications/et8918.pdf).

[40] Finding of Fact #9.

¶ 25. According to the Group Insurance Board's Findings of Fact, both the United Wisconsin Group and the Department's determinations "relied substantially on the medical opinions and evaluations of Ms. Gehin's condition by Dr. John Whiffen, Ms. Gehin's treating physician, and Dr. Richard Lemon, an independent medical consultant retained by UWG [United Wisconsin Group]."[41] The Group Insurance Board found that Drs. Lemon and Redlin both "believed the functional capacity evaluation conducted by Mr. Miller may have been incomplete or invalid."[42]

¶ 26. The Group Insurance Board conducted an evidentiary hearing on October 2, 2001, before Examiner Barry Stern.[43] According to the Pre-Hearing Conference Memorandum, the sole issue on appeal was: "Did the [Department of Employee Trust Funds] err in its . . . determination to terminate the [claimant's long-term income continuation insurance benefits] beyond April 30, 1997, under Section 5.14 – 4.b. of the contract effective January 1, 1995, between United Wisconsin Group (UWG) and the [Group Insurance] Board?"[44]

¶ 27. The claimant retained Dr. William Shannon to testify at the hearing. He had examined the claimant in 1999 and had also reviewed her medical records, including the reports by the United Wisconsin Group doctors and consultants. Dr. Shannon gave his expert opinion that the claimant met the definition of not being able to engage in substantial gainful activity

---

[41] Finding of Fact #10.

[42] Finding of Fact #12.

[43] Finding of Fact #2.

[44] Finding of Fact #3.

under the contract, that is, that she was "totally disabled" as defined by the contract.[45]

¶ 28. In the "Conclusions of Law" section of its Final Decision and Order, the Group Insurance Board pointed out that the claimant had the burden of satisfying the definition of " 'totally disabled' " under the contract.[46] The Group Insurance Board concluded that in determining "that the claimant was not disabled within the meaning of the contract, [United Wisconsin Group] and the [Department of Employee Trust Funds] reasonably accepted the opinions of [the claimant's] treating physician [Dr. Whiffen] and of [United Wisconsin Group's] expert over that of [Mr. Miller], who did not have the benefit of the contractual definition, and of a non-contemporaneous opinion by [the claimant's] expert [Dr. Shannon]."[47]

## III

¶ 29. We next turn to an examination of the evidence upon which the Group Insurance Board relied in its Findings of Fact. As is evident from the Findings of Fact and the references to the record in the Findings, the Group Insurance Board based its Findings of Facts on the written medical reports submitted by three doctors. The Group Insurance Board apparently relied on the doctors' reports to provide expert medical opinions about the claimant's physical work restrictions, her ability to work full time, and the type of work she could do. No evidence is in the record about the claimant's earning ability in either a full or part time job that

---

[45] Finding of Fact #13.

[46] Conclusion of Law #16.

[47] Conclusion of Law #17.

would meet the physical restrictions imposed on the claimant in the hearsay medical reports.

¶ 30. The parties agree, and so do we, that the three written medical reports that formed the basis of the Group Insurance Board Findings of Fact were hearsay.[48] None of the three doctors testified at the hearing.

¶ 31. Three witnesses testified at the hearing: Dr. Shannon, the claimant's expert witness, the claimant, and Diane Bass, a staff person employed by the Department of Employee Trust Funds.

¶ 32. In their oral testimony at the hearing, Dr. Shannon and the claimant consistently disagreed with the written hearsay reports of Dr. Whiffen, Dr. Lemon, and Dr. Redlin that had been submitted by the Department of Employee Trust Funds about the claimant's physical abilities.

¶ 33. Dr. Shannon testified that the claimant's pain and dysfunction prevented her from engaging in "any kind of gainful employment," either in 1997 or 1999. Although Dr. Shannon did not have the contractual definition of "totally disabled" (that is, the inability to engage in substantial gainful activity) at his 1999 examination of the claimant, when he was shown the contractual definition during his testimony at the hearing he opined that she certainly fit the definition, an opinion consistent with Mr. Miller's report.

¶ 34. Dr. Shannon also examined a functional capacity evaluation of the claimant and concluded that there had been no change since Mr. Miller's 1997

---

[48] Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Wis. Stat. § 908.01(3). "A 'statement' is (a) an oral or written assertion . . . ." Wis. Stat. § 908.01(1).

127

written evaluation. Dr. Shannon's oral testimony at the hearing corroborated Mr. Miller's written hearsay report, as well as Mr. Miller's conclusion about the claimant's disability.

¶ 35. The Group Insurance Board disregarded Dr. Shannon's expert opinion testimony, stating that Dr. Shannon did not treat or examine the claimant in 1997, the relevant time period.[49] Similarly the Group Insurance Board disregarded the hearsay written evaluation report of Mr. Miller.[50]

¶ 36. The claimant's testimony disagreed with Dr. Whiffen's and Dr. Lemon's reports about the amount of rest she needed and her ability to work full-time. The Group Insurance Board for all intents and purposes ignored the claimant's own testimony about her physical ability.

¶ 37. Although "Dr. Whiffen opined on February 7, 1997, that [the claimant] could work up to full-time with restrictions, including a need to change position every 45–60 minutes for five minutes," the claimant claimed she was incapable of sitting for more than 30 minutes at a time and that her rests often needed to be more than an hour—far longer than the five minutes suggested in Dr. Whiffen's written report. The claimant also disagreed with Dr. Lemon's assessment of her physical condition.

¶ 38. With regard to her unpaid vocational rehabilitation program at Mendota Mental Health Institute (described in a hearsay letter from that program), the claimant testified that she performed the described clerical tasks while taking rests. She testified that she had pain throughout this program, and the Group

---

[49] Finding of Fact #13.

[50] Finding of Fact #12.

Insurance Board found as a fact that due to pain and fatigue, the claimant fell short of the scheduled 40 hours per week, "generally working between 24 and 30 hours per week . . . ."[51]

¶ 39. The claimant expressly corroborated the letter's description of the clerical types of tasks she performed in the job-training program. Neither party has controverted the matters stated in the letter by live testimony or otherwise. The letter described the claimant's clerical tasks as "low level." The letter explains that the claimant must "test up" to be considered for a clerical job within the state system;[52] "[a]ny clerical position, within the state system, is at a higher 'range' than that of the typical DVR on-the-job retraining candidate. [The claimant](and all past DVR placements), must 'test' up to be considered for a clerical job within the state system. The entire process can take considerable time and be problematic in its self [sic]."[53] Thus the claimant's clerical tasks at the job training program did not qualify the claimant for a clerical position in state employment.

¶ 40. The claimant reported that she was unable to complete the program because of her pain and was unable to complete courses at the technical college because they were too difficult. She testified that her supervisor in the program advised her that given the level of pain, it was best if the claimant stopped

---

[51] Finding of Fact #7. The letter describing the program stated that sometimes the claimant worked less than 24 hours a week and equated the total time worked out of three years to be no more than half that because of her limited ability to work due to pain and a variety of medical leaves not necessarily connected with her injury.

[52] Exh. 22.

[53] Id.

participation in the program. The claimant thus corroborated the letter that she was not able to be at the job training program more than 24 to 30 hours a week (sometimes less), that she was in pain, and that she was unable to remain in one position (standing or sitting) for any length of time.

¶ 41. Nothing in the letter about the claimant's unpaid job training at Mendota Mental Health Institute reaches any conclusion about whether the claimant could engage in substantial gainful activity under the contract. Nothing in the letter describes what kind of jobs the claimant was able to work and what sums of money the claimant was able to earn in 1997 had she been able to work 24 hours a week. Assuming the claimant was able to work 24–30 hours per week, we calculate on the basis of the record that she would have had to earn between $8–$10 per hour at 1997 salary rates to earn $979.37 per month. The federal minimum wage in the spring of 1997 was $4.75 per hour.

¶ 42. The Department of Employee Trust Funds failed to present a single live witness to corroborate the contents of the written medical reports about the claimant's ability to work full time and their version of her physical work restrictions. The Group Insurance Board relied solely on these medical reports in its Conclusions of Law that the claimant could work full time with permanent work restrictions.

¶ 43. Although the Group Insurance Board calculated the minimum amount the claimant would have had to earn in the spring of 1997 to be engaging in substantial gainful activity, none of its findings (and none of the evidence) states that a job was available which fit the claimant's permanent work restrictions and would enable her to earn $979.37 per month on either a full or part time basis. The Group Insurance

Board merely quoted as a finding of fact Dr. Lemon's hearsay medical report stating that the claimant "could easily be employed as a receptionist where she is able to stand or sit using a telephone headset for comfort . . . [or] could do some light paperwork or computer work. I find it hard to believe that Ms. Gehin at only 53 years of age is totally unemployable."[54]

¶ 44. Bass's testimony, the only live testimony presented by the Department of Employee Trust Funds, was primarily about the terms of the income continuation insurance contract and the steps in the administrative proceedings.

¶ 45. An examination of the Board's Final Decision and Order and the record reveals that a number of the underlying facts (such as the events leading up to the back injury, the surgery, the insurance contract, and a history of the administrative procedure) were either undisputed or supported by live testimony. At best, the hearsay medical reports declared that the claimant is able to work full time with restrictions, namely a job in which she could alternate between sitting and standing, in which she need not lift more than 5 pounds, in which she need not do any carrying, and in which she must avoid stooping, bending or twisting. The written hearsay medical reports about the claimant's physical restrictions or ability to work full time, upon which the Group Insurance Board based its Findings of Fact and its decision to terminate the claimant's benefits, are uncorroborated and in fact were contradicted by live testimony.

¶ 46. The claimant's testimony and witnesses presented a prima facie case that she was not able to engage in substantial gainful activity under the terms

---

[54] Finding of Fact #11.

131

of the contract. She could not work full time, if at all. She could not stand or sit for any length of time and needed long rest periods. When the claimant was injured she was a housekeeper who bent, twisted and lifted. The claimant had limited education (10th grade), and her job experience before her injury was housekeeping. Her unpaid job training program at Mendota Mental Health Institute trained her for tasks that were below the standard for state clerical jobs, and she was at the job training program a maximum of 24–30 hours a week. She was not able to continue at the Institute because of her pain.

¶ 47. Therefore, if the uncorroborated written hearsay medical reports are eliminated from consideration, no evidence exists in the record to support the findings that the claimant was able to work full time with the permanent physical work restrictions described by the doctors or the Board's conclusion of law that the claimant did not meet the contractual requirements.

## IV

¶ 48. We next examine whether uncorroborated hearsay medical reports constitute "substantial evidence" as that phrase is used in both certiorari and Wis. Stat. § 227.57(6).[55] Substantial evidence has been defined in the case law as "that quantity and quality of evidence which a reasonable man could accept as ad-

---

[55] For a discussion of the history of the concept of substantial evidence in American administrative law, see E. Blythe Stason, *"Substantial Evidence" in Administrative Law*, 89 U. Pa. L. Rev. 1026 (1940–41).

equate to support a conclusion."[56] Cases state that substantial evidence is more than "a mere scintilla" of evidence[57] and more than "conjecture and speculation."[58]

¶ 49. As to admissibility of evidence, an agency or hearing examiner is not ordinarily bound by common law or statutory rules of evidence. The statute governing admission of evidence in contested cases before administrative agencies, Wis. Stat. § 227.45(1), explicitly states,

> [A]n agency or hearing examiner shall not be bound by common law or statutory rules of evidence. The agency or hearing examiner shall admit all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitive testimony . . . . Basic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact.

¶ 50. Accordingly, written hearsay medical reports are admissible as evidence in proceedings before the Group Insurance Board and such reports were properly admitted in the present case.

[56] *DeGayner & Co. v. DNR,* 70 Wis. 2d 936, 940, 236 N.W.2d 217 (1975). *See also Village of Menomonee Falls v. DNR,* 140 Wis. 2d 579, 594, 412 N.W.2d 505 (1987); *Gilbert v. State Med. Examining Bd.,* 119 Wis. 2d 168, 195, 349 N.W.2d 86 (1984); *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

[57] *Folding Furniture Works, Inc. v. Wis. Labor Relations Bd.,* 232 Wis. 170, 189, 285 N.W. 851 (1939) (quoting *Consol. Edison,* 305 U.S. at 229).

[58] *Princess House, Inc. v. DILHR,* 111 Wis. 2d 46, 53–54, 330 N.W.2d 169 (1983) (interpreting "substantial evidence" in the worker's compensation statute).

¶ 51. Although the admission of hearsay evidence makes administrative agency procedures simpler for both the litigants (who are frequently unrepresented) and the agency personnel, the relaxed evidentiary standard is not meant to allow the proceedings to degenerate to the point where an administrative agency relies only on unreliable evidence. The courts are required, under Wis. Stat. § 227.57(6), to "set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence."[59]

■

¶ 52. Properly admitted evidence may not necessarily constitute substantial evidence.

¶ 53. In defining substantial evidence more than 65 years ago, the Wisconsin Supreme Court declared in *Folding Furniture Works, Inc. v. Wisconsin Labor Relations Board* that "[m]ere uncorroborated hearsay . . . does not constitute substantial evidence."[60]

---

[59] Wisconsin Stat. § 227.57(6) reads:

If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

[60] *Folding Furniture*, 232 Wis. at 189 (quoting *Consol. Edison*, 305 U.S. at 235).

Indeed, it appears that the concept that hearsay, standing alone, cannot support a factual finding in an administrative setting has even earlier roots in Wisconsin. *See A. Breslauer Co. v. Indus. Comm'n*, 167 Wis. 202, 204 (1918).

This rule can be traced to the New York case, *Carrol v. Knickerbocker Ice Co.*, 113 N.E. 507 (1916).

134

¶ 54. The *Folding Furniture* court declared that the purpose of allowing the admission of hearsay evidence is to free administrative agencies from technical evidentiary rules, but at the same time this flexibility does not go so far as to justify administrative findings that are not based on evidence having rational probative force.[61] Thus the *Folding Furniture* court adopted the language from the U.S. Supreme Court case *Consolidated Edison Co. v. NLRB,* 305 U.S. 197 (1938), that mere uncorroborated hearsay or rumor does not constitute substantial evidence.[62]

¶ 55. This or similar language can be found in other Wisconsin cases.[63] In *Village of Menomonee Falls,*

---

[61] *Folding Furniture,* 232 Wis. at 189 (quoting *Consol. Edison,* 305 U.S. at 229). The U.S. Supreme Court stated:

> The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence. . . . Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion (citations omitted).

*Consol. Edison,* 305 U.S. at 229.

[62] *Folding Furniture,* 232 Wis. at 189.

[63] *See, e.g., Outagamie County v. Town of Brooklyn,* 18 Wis. 2d 303, 313, 118 N.W.2d 201 (1962); *Wis. Tel. Co. v. Indus. Comm'n,* 263 Wis. 380, 387, 57 N.W.2d 334 (1953); *A. Breslauer Co.,* 167 Wis. at 204.

*See also* Ralph M. Hoyt, *The Wisconsin Administrative Procedure Act,* 1944 Wis. L. Rev. 214 ("[C]ourts have never permitted these [administrative] bodies to ground their find-

for example, the court reiterated that "administrative bodies should never ground administrative findings upon uncorroborated hearsay."[64]

¶ 56. The rule that uncorroborated hearsay alone does not constitute substantial evidence allows an agency to utilize hearsay evidence while not nullifying the relaxed rules of evidence in administrative hearings. The rule prohibits an administrative agency from relying *solely* on uncorroborated hearsay in reaching its decision. This rule defining substantial evidence has been followed in Wisconsin since *Folding Furniture* was decided in 1939. There has been no suggestion that this rule has hindered the operation of state administrative agencies.

---

ings upon testimony which violate[s] fundamental principles of probative force—for instance, upon uncorroborated hearsay or rumor.").

The legislature has placed limits on the weight hearsay may be given in small claims proceedings. Wisconsin Stat. § 799.209(2) provides: "The proceedings shall not be governed by the common law or statutory rules of evidence except those relating to privileges under ch. 905 [e.g., lawyer-client, physician-patient, spousal] or to admissibility under s. 901.05 [HIV tests]. The court or circuit court commissioner shall admit all other evidence having reasonable probative value, but may exclude irrelevant or repetitious evidence or arguments. *An essential finding of fact may not be based solely on a declarant's oral hearsay statement unless it would be admissible under the rules of evidence*" (emphasis added). At least one published decision in Wisconsin has read this statute to require corroborative evidence of an oral hearsay statement in order to form the basis of an essential finding. *Scholten Pattern Works, Inc. v. Roadway Express, Inc.,* 152 Wis. 2d 253, 257, 448 N.W.2d 670 (Ct. App. 1989).

[64] *Village of Menomonee Falls,* 140 Wis. 2d at 610.

136

¶ 57. The rules governing proceedings before the Group Insurance Board apparently define substantial evidence as non-hearsay evidence. The rule states that "[n]o finding of fact may be based on hearsay."[65] The Group Insurance Board is exempt from having to publish or retain permanently its own decisions.[66] We therefore do not know how the Group Insurance Board has interpreted the ETF rule that no finding of fact may be based on hearsay. Nothing in the record explains why the Group Insurance Board deviated from this rule and case law defining substantial evidence to prohibit reliance solely on hearsay.

---

[65] Wis. Admin. Code § ETF 11.12(2)(b) (Jan. 2004).

Other administrative agencies have rules governing the admissibility and weight of hearsay evidence. *See, e.g.,* Wis. Admin. Code § INS 5.39(5)(a)1 (Feb. 1999) ("The administrative law judge may admit hearsay evidence and shall accord it as much weight as the administrative law judge considers warranted by the circumstances.); Wis. Admin. Code PC 5.03(5) (Jan. 2003) (Hearsay evidence may be admitted into the record at the discretion of the hearing examiner or commission and accorded such weight as the hearing examiner or commission deems warranted by the circumstances.); Wis. Admin. Code TCS 12.10(4)(e) (July 2002) (Unless objected to by the board, any summary of testimony of a witness for the person who requested the hearing shall be made part of the record in lieu of the testimony of that witness as an exception to the hearsay rule and shall be considered by the board for whatever probative value that testimony has in making its decision.); Wis. Admin. Code DWD 140.16(1) (Sept. 2000) (Hearsay evidence is admissible if it has reasonable probative value but no issue may be decided solely on hearsay evidence unless the hearsay evidence is admissible under ch. 908, Stats. [rules of evidence]).

[66] Wis. Stat. § 40.07; Wis. Admin. Code § ETF 11.13(2) (Jan. 2004).

¶ 58. The substantial evidence rule proscribing an administrative agency's relying solely on uncorroborated hearsay is sometimes called the legal residuum rule.[67] This rule is based in part on the reasoning that "since hearsay, due to its second hand nature, is inherently suspect, a determination based solely on hearsay can never be more than conjecture."[68]

¶ 59. The legal residuum rule is supported by the notion that the courts should act as a check on the agencies by reviewing the decisions for fundamental fairness.[69] The rule "gives to the reviewing court as the natural guardian of the public's legal rights, an addi-

_____

[67] Whether called the residuum rule or the substantial evidence test, in Wisconsin the substantial evidence rule has functionally operated like the residuum rule. *See* John Wigmore, 1 *Wigmore on Evidence* § 4b at 122–24 (Tillers Rev. 1983) ("The residuum rule generally has been abandoned. It has been replaced by the 'substantial evidence' standard. . . . Some courts, however, have effectively subverted the original purpose of the substantial evidence standard by holding that hearsay evidence in and of itself cannot constitute 'substantial evidence.' ") (footnotes omitted).

[68] Leonard M. Simon, *The Weight To Be Given Hearsay Evidence By Administrative Agencies: The "Legal Residuum" Rule,* 26 Brook. L. Rev. 265, 267 (1959–60).

[69] *See, e.g.,* Daniel R. Schuckers, *The "Legal Residuum Rule" Should Be Abolished in Pennsylvania,* 75 Pa. Bar Ass'n Q. 1, 3 (Jan. 2004), John L. Gedid, *The "Legal Residuum" Rule Should Be Retained in Pennsylvania Because of Its Function To Insure Fundamental Fairness and Due Process,* 75 Pa. Bar Ass'n Q. 7 (Jan. 2004); E. Blythe Stason, *"Substantial Evidence" in Administrative Law,* 89 U. Pa. L. Rev. 1026, 1029 (1940–41); Bernard Schwartz, *Administrative Law* § 7.4 at 376 (3d ed. 1991).

tional device to retain control over administrative determinations, which due to the informalities of proceeding may easily go astray."[70]

¶ 60. The legal residuum rule has been criticized by commentators because the rule produces "a hybrid situation in which commissioners could freely hear all the incompetent evidence they pleased, but could make no legal use of it."[71] Professor Davis argues that an

---

[70] Simon, *supra* note 68, at 268.

[71] Schwartz, *supra* note 69, § 7.4 at 376 (quoting 2 Arthur Larson, *The Law of Workmen's Compensation* § 79.30 (1981)); 7 *Larson's Workers' Compensation Law* § 127.02 (2004) (discussing the use of the legal residuum rule in the workers' compensation setting as follows: "[T]he 'residuum rule' has been followed in the majority of jurisdictions, although it has been under constant attack ever since it was announced.")

*See* Kenneth Culp Davis, *Hearsay in Administrative Hearings,* 32 Geo. Wash. L. Rev. 689, 697 (1964) (criticizing the rule); Ernest Gellhorn, *Rules of Evidence and Official Notice in Formal Administrative Hearings,* 1971 Duke L.J. 1, 24 ("[I]t has been severely criticized by scholars, and its application has strained judicial reasoning."); Wigmore, *supra* note 67, § 4b ("The residuum rule generally has been abandoned [citing federal, Kansas and New York cases for this proposition, but then citing California and New Mexico cases for the contrary position]. It has been replaced by the substantial evidence standard. . . . Some courts, however, have effectively subverted the original purpose of the substantial evidence standard by holding that hearsay evidence in and of itself cannot constitute substantial evidence [citing federal, New Mexico and New York cases] (internal quotations and footnotes omitted).).

*But see* 1 Cooper, *State Administrative Law* 410–412 (1965):

On the other hand, it is urged that the existence of the rule has accomplished considerable good, because the fear that it may be invoked has led agencies to insist on careful presentation and detailed examination of the evidence offered in contested cases; and because it has had the effect of inducing agencies to apply the

alternative to the legal residuum rule is not to allow administrative agencies to use unreliable evidence, but to grant them discretion to determine what evidence is reliable and then if circumstances warrant, to allow the agency to rely on it.[72] The basic criticism of the legal residuum rule is that it ignores the reliability of evidence incompetent under the hearsay rule.

¶ 61. Departure from the legal residuum rule has also been criticized. In 1981 in *Unemployment Compensation Board of Review v. Ceja,* 427 A.2d 631 (Pa. 1981), in a single justice's opinion not joined by any other member of the court,[73] the Pennsylvania Supreme Court appeared to reject the legal residuum rule in favor of a reliability of the hearsay evidence rule. Several members of the court wrote separately, concluding that the new guidelines the single justice's opinion set forth on the reliability of the hearsay escape comprehension, invited confusion, and lacked uniformity in the conduct of administrative hearings.[74] In 1985 the Pennsylvania Supreme Court explicitly stated that the *Ceja* case does not represent the law of Pennsylvania.[75]

rules of evidence in much the same fashion as they are applied by judges sitting in non-jury trial civil cases.

[72] Davis, *supra* note 71, at 697; Kenneth Culp Davis, *The Residuum Rule in Administrative Law,* 28 Rocky Mt. L. Rev. 1, 4–6 (1955).

[73] *Ford v. Unemployment Comp. Bd. of Review,* 498 A.2d 449, 451 (Pa. 1985).

[74] *Unemployment Comp. Bd. of Review v. Ceja,* 427 A.2d 631, 645 (Pa. 1981).

[75] *Ford,* 498 A.2d at 451. *See also Ridley School Dist. v. Unemployment Comp. Bd. of Review,* 637 A.2d 749, 752 (1994)(a finding of fact based solely on hearsay cannot stand).

¶ 62. While *Perales* may have affected the legal residuum rule in federal social security cases, many states continue to operate under rules that function like the legal residuum rule.[76]

---

[76] *See* Schwartz, *supra* note 69, § 7.4 at 377.

Many states apply some form of the legal residuum rule. *See, e.g.,* Ala. Admin. Code r. 482–1-065–.04(9)(b) (2004) (hearsay is "not sufficient to prove any material fact" unless that hearsay would be admissible under a court-recognized exception); *Libby, McNeill & Libby v. Alaska Indus. Bd.,* 12 Alaska 584, 588 (1950) ("Undoubtedly an award based solely on hearsay cannot stand . . . ."); *Black Mountain Spruce, Inc. v. Johnson,* 670 P.2d 1241, 1243 (Colo. App. 1983) ("[I]t is not error for an administrative agency to admit hearsay evidence, as long as it is not the sole support for the agency's findings . . . ."); *Application of Citizens Utils. Co.,* 351 P.2d 487, 490 (Idaho 1960) ("[The agency] cannot make a finding based upon hearsay."); 11 Ky. Admin. Regs. 3:100, Section 3(4)(a)(3) (2004) ("The hearing officer may receive evidence deemed reliable and relevant, including evidence that would be considered hearsay if presented in court, except that hearsay evidence shall not be sufficient in itself to support the hearing officer's decision."); *Credit v. Whitfield,* 488 So. 2d 1064, 1066 (La. 1986) ("The jurisprudence firmly establishes that the [agency] may not base its decision solely on hearsay. Reliance on hearsay and nothing more shatters the competence and sufficiency of the evidence and undermines the employer's burden of proof. . . . [W]e reiterate the jurisprudence that the employer may not base its entire case on hearsay when the claimant offers direct, contradictory evidence." (citations omitted)); Minnesota Rules, part 5601.3145, subp. 3 (2003) ("Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but is not sufficient in itself to support a finding unless it would be admissible over objection in civil actions"); Code Miss. R. 06 000 038, Section 7(c) (2004) ("However, hearsay evidence (if presented) shall not be the sole basis for the determination of facts by the review officer"); Mont. Admin. R. 24.9.312 (2004) ("Hearsay evidence may be received and considered to supple-

¶ 63. The court of appeals concluded in the instant case that it should follow *Richardson v. Perales,* 402 U.S. 389 (1971), rather than *Folding Furniture.* In *Perales,* the United States Supreme Court concluded that hearsay evidence is substantial evidence under the social security statute and that the agency's reliance on hearsay evidence to support its legal conclusion did not violate due process. The social security statute in issue

ment other evidence, but such hearsay evidence may not be considered to support a finding unless it would otherwise be admissible over objection in civil actions or under the Montana Rules of Evidence."); *In re Toth,* 418 A.2d 272, 277 (N.J. Super. Ct. App. Div. 1980) "[T]he rule in this State is that a factfinding or legal determination cannot be based on hearsay alone. Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony."); *Trujillo v. Employment Sec. Comm'n,* 610 P.2d 747, 748 (N.M. 1980) ("[U]nemployment compensation [is] a substantial right as a matter of public policy. The benefits in this case may not be denied on the basis of controverted hearsay alone. Controverted hearsay under these facts does not qualify as substantial evidence."); *Bermudez v. Blum,* 423 N.Y.S.2d 11, 12 (App. Div. 1979) ("While an administrative determination, after fair hearing, may be supported by hearsay, it may not be based entirely thereon."); Utah Admin. R. 51-2-12 C. ("Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would be admissible in a judicial proceeding."); Wis. Admin. Code § DWD 140.16 ("Hearsay evidence is admissible if it has reasonable probative value but no issue may be decided solely on hearsay evidence unless the hearsay evidence is admissible under ch. 908, Stats."). *See also* Ernest H. Schopler, *Comment Note—Hearsay Evidence in Proceedings Before State Administrative Agencies,* 36 A.L.R.3d 12 (2004) (including a number of the cases listed above).

in *Perales* stated: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."[77]

¶ 64. *Perales* casts doubt on the continued viability of *Consolidated Edison,* upon which *Folding Furniture* relied.[78] The *Perales* court explained away the *Consolidated Edison* language that "mere uncorroborated hearsay" is not substantial evidence as follows:

> Although the reports are hearsay in the technical sense, because their content is not produced live before the hearing examiner, we feel that the claimant and the Court of Appeals read too much into the single sentence from *Consolidated Edison.* The contrast the Chief Justice was drawing, at the very page cited, was not with material that would be deemed formally inadmissible in judicial proceedings but with material "without a basis in evidence having rational probative force." This was not a blanket rejection by the Court of administrative reliance on hearsay irrespective of reliability and probative value. The opposite was the case.[79]

¶ 65. One commentator has written that *Perales* has not been interpreted as "a blanket rejection of the residuum rule. The rule bars not 'administrative reliance on hearsay,' but administrative reliance on hearsay *alone.*"[80] Another commentator has concluded that "it is doubtful that *Perales* can be viewed as having discarded the Hearsay Rule in agency adjudications. In effect,

---

[77] *Perales,* 402 U.S. at 390.

[78] *See* Kenneth Culp Davis, *Administrative Law Text* 282 (3d ed. 1972); Kenneth Culp Davis, *Administrative Law of the Seventies* § 14.11 at 339–42 (1976).

[79] *Perales,* 402 U.S. at 402–03.

[80] Schwartz, *supra* note 69, § 7.6 at 381.

medical reports constitute a class exception, at least in Social Security disability cases."[81]

¶ 66. *Perales* must be examined in context and is not applicable to the present case. The *Perales* discussion must be understood against the backdrop that an applicant was denied social security benefits (rather than having benefits terminated); that the Social Security Administration considers more than one million disability applications a year;[82] that most claimants are not represented by counsel; and that procedures must be kept as simple and inexpensive as possible for the system to work.

¶ 67. Furthermore, in *Perales* the doctors' written reports were corroborated by in-person testimony. The evidence in *Perales* consisted of written medical reports harmful to Perales' claim, two witnesses' testimony that controverted the written reports, and a government-paid doctor's testimony that corroborated the substance of the written hearsay reports.[83]

¶ 68. Courts that follow *Perales* conclude that hearsay can be substantial evidence if the evidence has sufficient probative force for a reasonable person to accept it as adequate support of the agency's conclusion.[84]

---

[81] James L. Rose, *Hearsay in Administrative Adjudications,* 6 Admin. L. J. Am. U. 459, 475 (1992).

[82] Rose, *supra* note 81, at 475.

[83] *Perales,* 402 U.S. at 395–96. *See State v. Watson,* 227 Wis. 2d 167, 172, 191, 595 N.W.2d 403 (1999) (holding that the testimony of an expert witnesses who relies on inadmissible hearsay is itself admissible in evidence).

[84] Schwartz, *supra* note 69, § 7.6 at 382.

¶ 69. Medical reports arguably have indicia of reliability and therefore seem to have probative force; they are furnished by independent, impartial experts and are arguably admissible as exceptions to the hearsay rule.

¶ 70. Nevertheless, the reliability and probative force of the written medical reports in the present case are suspect. As noted by the Supreme Court of Mississippi in examining hearsay medical reports in the workmen's compensation context,

> It is quite likely that the bench and bar would be scandalized if this Court should approve the receiving in evidence of ex parte, unsworn statements of persons other than doctors, even in Workmen's Compensation cases.
>
> While doctors occupy an important role in our scheme of things, they are, after all, merely human, and may not be considered wholly free from the frailties that beset the rest of us. There is nothing, therefore, in the fact that a witness may be a member of the medical profession that reasonably may be said to justify his exemption from the requirements and restriction which would apply to others giving testimony in an adversary proceeding. The admission of the reports constitutes reversible error.[85]

¶ 71. One report was written by Dr. Lemon who was retained by United Wisconsin Group specifically to evaluate the claimant in connection with her claim. Although Dr. Lemon was provided with the contractual definition of "substantial gainful activity" and the $979.37 per month earnings figure, the form he was

[85] *Georgia-Pacific Corp. v. McLaurin,* 370 So. 2d 1359, 1362 (Miss. 1979).

145

asked to complete did not ask for his opinion whether the claimant fit the contract definition.

¶ 72. Dr. Lemon never rendered an opinion whether the claimant was able to engage in substantial gainful activity under the contract. Dr. Lemon remarked that he could not believe she was "totally unemployable." This remark is not responsive or relevant to the issue of substantial gainful activity under the contract; under the contract a person may be employable but the earning capacity is less than that specified under the contractual definition.

¶ 73. Dr. Lemon's remark about his disbelief that the claimant is "totally unemployable," which the Group Insurance Board incorporated in its Findings of Fact, is inconsistent with the Group Insurance Board's finding of fact that "Dr. Lemon concluded that Gehin did not meet the contractual long-term benefit definition."[86]

¶ 74. Dr. Whiffen completed a form dated November 27, 1996, asking whether the patient is totally disabled. His markings on the form are internally inconsistent. In response to the question on the printed form whether patient is now totally disabled from the patient's job, Dr. Whiffen checked the "Yes" box clearly. (Although another of his responses might be interpreted that the claimant could return to her former job). He also checked the "No" box, but somewhat less clearly. He checked another box "No" in response to the question of whether the claimant was totally disabled for any other work. Dr. Whiffen's opinion about whether the claimant was totally disabled for any other work consisted of check marks in boxes on a printed form presented to him.

---

[86] Finding of Fact #11.

¶ 75. Nothing in the form refers to the contractual definition of "totally disabled," that is that the claimant cannot engage in substantial gainful activity. Therefore we do not know what definition of totally disabled Dr. Whiffen was using.

¶ 76. In response to the question what duties the claimant is incapable of performing the doctor wrote "bending twisting heavy lifting." Checking the boxes, Dr. Whiffen restricted lifting to 11–24 pounds and restricted bending to a "maximum of 0–2 times per hour."

¶ 77. In January 1997, after completing the 1996 form, Dr. Whiffen was advised of the contract definition of substantial gainful activity but was not advised that the claimant would be disqualified only if she were able to earn at least $979.37 per month. In the form presented in January 1997, Dr. Whiffen was never asked and never answered whether the claimant was totally disabled under the contract and never gave an opinion on that matter. Dr. Whiffen wrote that the claimant could work up to full time, was experiencing pain after prolonged sitting, and "must be able to change position every 45–60 min for 5 min."

¶ 78. In May 1997 Dr. Whiffen appears to have had second thoughts about the claimant's ability and the record shows he called for a functional capacity evaluation. Dr. Whiffen retired soon thereafter.

¶ 79. Without Dr. Whiffen's and Dr. Lemon's testimony about what they meant by their responses, their reports are not reliable as a basis for the Group Insurance Board's findings of fact about her permanent physical work restrictions and her ability to work full-time or the Board's conclusions of law that the claimant was not totally disabled under the contract.

147

¶ 80. Weighing the nature of the doctors' responses, the importance of the facts sought to be proved by the hearsay medical reports to the outcome of the proceedings and considerations of economy; the evidence opposing the hearsay reports; the lack of any corroborative evidence supporting the hearsay reports; the failure of the Department of Employee Trust Funds to call the doctors to testify; and the outcome for each party, our conclusion that the Group Insurance Board should not have relied solely on the hearsay evidence is appropriate in the instant case, even under *Perales*.[87]

¶ 81. We see no reason to deviate in the instant case from the long-standing rule in Wisconsin as announced in *Folding Furniture* and consistently followed for 65 years in subsequent cases that uncorroborated hearsay alone does not constitute substantial evidence in administrative hearings. The rule balances competing concerns about administrative expediency and fundamental fairness.

■

¶ 82. Fairness requires that in the face of contrary in-person testimony, if the Group Insurance Board seeks to terminate a claimant's benefits, it should be required to corroborate hearsay evidence if that evidence is to form the sole basis for its decision. The harm to claimants in having their income continuation insurance benefits terminated on the basis of controverted written hearsay medical reports, without an opportunity to cross-examine the authors of the reports, exceeds the burden on the Group Insurance Board to call

---

[87] For a discussion of these factors by a court that rejected the legal residuum rule, see *Reguero v. Teacher Standards & Practices Comm'n,* 822 P.2d 1171 (Or. 1991).

a witness to corroborate those hearsay medical reports. Accordingly we do not adopt the *Perales* rule in the present case.

V

¶ 83. The court of appeals offered three reasons why the *Perales* reasoning should be adopted and why the legal residuum rule should not be applied in the present case. We are not convinced by any of them.

¶ 84. First, the court of appeals concluded that the legal residuum rule should not apply when the opposing party could have subpoenaed the author of a hearsay report to controvert or challenge the written report. Thus the court of appeals placed the onus on the claimant to subpoena the Group Insurance Board's expert witnesses. The claimant's ability to subpoena expert witnesses may be "more theoretical than real."[88] We are therefore not persuaded that the burden should be placed on a claimant to furnish witnesses who will

---

[88] In analyzing *Perales,* Professor Bernard Schwartz notes:

In addition, the right of the claimant to subpoena examining physicians is more theoretical than real in the vast majority of . . . cases where claimants are unrepresented by counsel. Even when there is counsel, the right to subpoena is one that is almost never exercised. The realities of law practice and fee limits . . . normally mean that the lawyer for the claimant is not able to give the time needed to examine the agency file until the hearing. Asking for subpoenas at that time means a continuance, with the need for the lawyer to give up the time needed to appear for the hearing a second time.

Schwartz, *supra* note 69, § 7.6 at 382.

For discussions of subpoenas of experts, see *Glenn v. Plante,* 2004 WI 24, ¶ 2, 269 Wis. 2d 575, 676 N.W.2d 413; *In re Imposition of Sanctions in Alt v. Cline,* 224 Wis. 2d 72, 86, 589 N.W.2d 21 (1999).

149

correct the deficiencies in the evidence produced by the Department of Employee Trust Funds.

¶ 85. Second, the court of appeals concluded that the legal residuum rule does not apply when the hearsay is a document admissible as an exception to the hearsay rule. The legal residuum rule, asserts the courts of appeals, is based on the notion that hearsay evidence is unreliable only when it does not fall within a hearsay exception. The court of appeals' position that hearsay evidence that is admissible as an exception to the rule does not fall within the legal residuum rule has been adopted in some cases and recommended by some commentators.[89]

¶ 86. The parties agree, as do we, that the medical records were properly admitted under the relaxed evidentiary rules applicable to administrative hearings. The parties dispute whether the evidence is admissible as an exception to hearsay under either Wis. Stat. § 908.03(6), as documents made in the course of regu-

---

[89] *See, e.g., Bransford v. State Taxation & Revenue Dep't,* 960 P.2d 827, 832 (N.M. App. 1998) (admissible hearsay may satisfy the legal residuum rule); *Morgenstern v. Dep't of Motor Vehicles,* 111 Cal. App. 4th 366, 372 (4th Dist. 2003) (officer's report was admissible under the employee business records exception to the hearsay rule and will support the department's findings); Elliot B. Glicksman, *The Modern Hearsay Rule Should Find Administrative Law Application,* 78 Neb. L. Rev. 135, 140 (1999) ("The residuum rule is not a satisfactory substitute for the exclusion of all hearsay proofs. Instead, a liberal reading of the modern hearsay rule and its defined exceptions and exclusions would better satisfy credibility critics while preserving and promoting the idealism behind the administrative law process.").

larly conducted business,[90] or Wis. Stat. § 908.03(6m), as health care provider records.[91] Dr. Lemon did not provide health care; he examined the claimant to render an opinion for purposes of this dispute about coverage.

¶ 87. The admissibility of these reports as exceptions to the hearsay rule is not clear-cut. Before a record is admissible under Wis. Stat. § 908.03(6), a custodian or qualified witness must testify. No such testimony was presented here. Before a record is admissible under Wis. Stat. § 908.03(6m), a qualified witness need not testify but the party offering health care provider records must serve or give notice to the other party.

¶ 88. Moreover, the admission of the doctors' reports as an exception to hearsay is not automatic; admission is a discretionary decision. "A medical record containing a diagnosis or opinion . . . may be excluded in the trial judge's discretion if the entry requires explanation or a detailed statement of the judgmental factors upon which the diagnosis or opinion is based."[92] This exercise of discretion especially comes into play with documents that have been prepared in anticipation of litigation.[93] The record does not show that anyone admitted the reports as exceptions to the hear-

[90] *See* Daniel D. Blinka, 7 *Wisconsin Practice: Wisconsin Evidence* 620–29 (2d ed. 2001).

[91] Blinka, *supra* note 90, at 630–33.

[92] *Noland v. Mut. of Omaha Ins. Co.*, 57 Wis. 2d 633, 641–42, 205 N.W.2d 388 (1973); *Pophal v. Siverhus*, 168 Wis. 2d 533, 560, 484 N.W.2d 555 (Ct App. 1992). *See also* Blinka, *supra* note 90, at 632.

[93] Blinka, *supra* note 90, at 627–28.

say rule or exercised any discretion in concluding that the hearsay reports should be admitted as exceptions to the hearsay rule. We have previously addressed the reliability of the reports.

¶ 89. Without deciding whether all or any parts of the written medical reports in the present case are admissible under a hearsay exception, we conclude that the court of appeals' reasoning that hearsay evidence is unreliable only when it does not fall within a hearsay exception confuses the admissibility of hearsay with the issue of the probative force to be accorded the hearsay evidence by an administrative agency decision-maker. Hearsay that is subject to an exception is still hearsay, and therefore the substantial evidence rule applies even to evidence admitted as an exception to the hearsay rule.

¶ 90. The dilemma, however, is that if hearsay is admissible in court as an exception to the hearsay rule and a fact-finder in a judicial proceeding may base its decision on admissible hearsay, why then apply what appears to be a more restrictive rule barring an administrative agency from basing its decision on uncorroborated hearsay that falls within a hearsay exception? The primary reason is that in administrative hearings the claimants are often not represented by counsel and decision-makers are often not attorneys. Requiring decision-makers to determine whether hearsay evidence falls within a hearsay exception defeats the reasons for relaxed standards for the admissibility of evidence in administrative agencies. The protection for the parties lies in the requirement that hearsay evidence must be corroborated if an agency is to rely on it as the sole evidence.

¶ 91. The Group Insurance Board is in effect arguing that the legal residuum rule is not needed in the present case because medical reports are reliable evidence. Even though medical reports generally may be viewed as reliable, our review of the record raises significant questions about the reliability of these controverted reports and about the need for clarification of the reports by live testimony. Therefore, without corroboration they alone would not satisfy the requirements of the substantial evidence standard as probative, reliable evidence.

¶ 92. Third, the court of appeals concluded that when more than one written hearsay report contains essentially the same information, each hearsay report is corroborated by the other. If the agency is permitted to bootstrap uncorroborated hearsay with other uncorroborated hearsay, the result would be the evisceration of the requirement that there be corroboration of hearsay in order for the hearsay evidence to form the basis of an agency's findings of fact. Requiring corroboration of hearsay by non-hearsay evidence ensures that the evidence is properly tested, thereby ensuring the fundamental fairness of administrative proceedings. We therefore conclude that in the present case hearsay evidence cannot corroborate hearsay evidence.

¶ 93. The interpretation of the corroboration requirement in the present case should be compared with the interpretation of the corroboration requirement in other circumstances.

¶ 94. For example, Wis. Stat. § (Rule) 908.045, a rule governing admission of evidence (rather than governing the probative force of admitted evidence) requires corroboration of certain hearsay evidence. Section 908.045 provides: "A statement tending to expose

the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated."

¶ 95. The supreme court interpreted corroboration in Wis. Stat. § 908.045 to mean the presentation of other evidence "sufficient to permit a reasonable person to conclude, in light of all the facts and circumstances, that the statements could be true . . . ."[94] The court then allowed multiple hearsay statements that were against the declarant's penal interest and were offered to exculpate the accused to corroborate each other when the statements were identical in nature and had been made to multiple third parties.[95] Thus, the court interpreted multiple hearsay statements against penal interest as corroborating each other.

¶ 96. The cases interpreting the corroboration requirement in Wis. Stat. § (Rule) 908.045 are based on the legal system's special concerns about wrongful convictions and a defendant's constitutional right to present a defense: "The critical need for hearsay evidence, in particular statements against penal interests, is especially apparent in criminal trials where the exclusion of a statement [against the declarant's penal interest] exculpating an accused could result in an erroneous conviction."[96]

¶ 97. These constitutional considerations about an accused's right to present a defense are not applicable in the instant case. Several records containing

---

[94] *State v. Anderson,* 141 Wis. 2d 653, 662, 416 N.W.2d 276 (1987).

[95] *See State v. Guerard,* 2004 WI 85, ¶ 5, 273 Wis. 2d 250, 682 N.W.2d 12; *Anderson,* 141 Wis. 2d at 668.

[96] *Anderson,* 141 Wis. 2d at 662 (citing *Chambers v. Mississippi,* 410 U.S. 284 (1973), for the proposition that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.").

similar medical opinions from different doctors do not raise the same evidentiary or constitutional considerations as a declarant's oft-repeated statements that tend to expose that individual to criminal prosecution and thereby exculpate an accused.

¶ 98. The requirement of corroboration has also been interpreted in the context of newly discovered recantation evidence. The court has required that when newly discovered evidence is a witness's recantation, the recantation must be corroborated by other newly discovered evidence.[97] Corroboration is required because recantation is inherently unreliable; the recanting witness is admitting he or she lied under oath. Either the original testimony or the recantation is false.

¶ 99. The court recognized that "requiring a defendant to redress a false allegation with significant independent corroboration of the falsity would place an impossible burden upon a wrongly accused defendant."[98] The court concluded that the degree and extent of corroboration required in recantation circumstances varies from case to case. In one case the court held that corroboration may be achieved when a feasible motive for the initial false statement exists and circumstantial guarantees of trustworthiness of the recantation exist.[99]

¶ 100. The present case differs from recantation cases. Requiring the Department of Employee Trust Funds to produce a doctor who examined the claimant or her records can hardly be said to present the same

---

[97] *State v. McCallum*, 208 Wis. 2d 463, 473–74, 476, 561 N.W.2d 707 (1997).

[98] *Id.* at 477.

[99] *Id.* at 478.

burden as requiring independent corroboration of the falsity of an original statement in recantation cases.

¶ 101. The present case is thus not governed by the corroboration requirements set forth in cases involving recantation or a statement against penal interest.

## VI

¶ 102. The Group Insurance Board raises two arguments in support of the decision of the court of appeals. First, it argues that if this court adopts the claimant's position, claimants who may not be able to afford expert witnesses to corroborate medical reports are placed at a serious disadvantage in proceedings such as this one. Yet in the present case, it was the Group Insurance Board, not the claimant, that introduced the hearsay evidence.

¶ 103. We recognize the importance of allowing claimants to present their position as simply and inexpensively as possible, including by means of written medical reports without having to present the testimony of the author of the reports. This decision should not be read to require corroboration by non-hearsay evidence in all instances.

¶ 104. Corroboration of hearsay is not always required in administrative proceedings. For example, the parties may stipulate to some or all of the facts or to the submission of and reliance upon the contents of written hearsay reports. The parties may also agree that the agency may base its findings of fact solely on uncorroborated hearsay. As the circuit court pointed out in the present case, the legal residuum rule does not prevent parties from stipulating to factual findings.

¶ 105. Requiring corroboration of controverted hearsay evidence upon which the Group Insurance Board bases its findings of fact is not as burdensome as the Group Insurance Board suggests. Apparently numerous administrative agencies conduct their business adhering to the rule that findings of fact cannot be based solely on uncorroborated hearsay evidence. For example, the Labor and Industry Review Commission routinely cites and adheres to the rule that uncorroborated hearsay may not form the sole basis for resolution of an issue.[100]

¶ 106. Second, the Group Insurance Board argues that the claimant and her attorney failed to object to the admission and use of the uncorroborated hearsay reports and therefore waived the right to challenge the Board's reliance on the reports when offered, or on appeal.

¶ 107. When the medical reports were admitted, the claimant's objection to admissibility on the ground of hearsay would have been futile. Arguably the claimant had an opportunity to object to the Findings of Fact being based on uncorroborated hearsay evidence when the Proposed Findings of Fact and Conclusions of Law

---

[100] *Merta v. Johnson Controls, Inc.*, ERD Case No. CR200000928 (LIRC Oct. 30, 2003) (crucial finding of fact may not be based solely on uncorroborated hearsay evidence relying on *Village of Menomonee Falls*, 140 Wis. 2d 579)); *T-N-T Express LLC v. TNT Express Delivery*, UI Dec. Hearing No. S9700385 (LIRC Feb. 22, 2000) (citing Wis. Admin. Code § DWD 140.16 that subject to some exceptions, uncorroborated testimony is not a sufficient basis upon which to decide an issue); *Loberger v. Alex Logan Wholesale Flooring*, UI Dec. Hearing No. S9800050MD (LIRC June 30, 1999) (same). These decisions are available online in searchable format at http://www.dwd .state.wi.us/lirc.

were released. The circuit court ruled that the claimant was not required to object and that the claimant therefore did not waive her objections.[101]

¶ 108. "[W]hether [this court] should review an issue raised here for the first time depends upon the facts and circumstances disclosed by the particular record. The question is one of administration, not power."[102] The general rule is that an appellate court will not "consider issues beyond those properly raised before the administrative agency, and a failure to raise an issue generally constitutes a waiver of the right to raise the issue before a reviewing court."[103] As with most rules, however, there are exceptions.[104]

---

[101] The circuit court relied on Wis. Admin. Code § ETF 11.09(3), which provides as follows:

(3) OBJECTIONS. Any party aggrieved by the proposed decision *may* file a written objection to the proposed decision within 20 days of the date of the notice of the proposed decision. The aggrieved party shall specify, in detail, the following:

(a) Each provision of the proposed decision to which the party objects and the basis for each objection.

(b) Each change the party requests the board to make in the proposed decision and the legal grounds for the change. If minor, the requested change may be described as a specific edit to the proposed decision. If extensive or major changes are requested, the party may attach a draft proposed decision, clearly marked as that party's draft, to that party's objections (emphasis added).

[102] *State ex rel. Gen. Motors Corp. v. City of Oak Creek,* 49 Wis. 2d 299, 319, 182 N.W.2d 481 (1971).

[103] *State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, ¶ 55, 244 Wis. 2d 613, 628 N.W.2d 376.

[104] One exception is that "if all the facts are of record and the issue is a legal one of great importance" we will overlook any waiver issues. *Outagamie County,* 244 Wis. 2d 613, ¶ 56; *State*

¶ 109. We need not decide whether the claimant waived her right in the present case to challenge the bases of the Findings of Fact. We address the issue presented here because the parties have had an opportunity to brief the substantial evidence issue and because the application of the legal rule announced in *Folding Furniture* presents an issue of importance. Additionally, unpublished decisions of the court of appeals take different views of the applicability of *Folding Furniture* and *Perales*.[105]

¶ 110. For the reasons stated, we conclude that the uncorroborated written hearsay medical reports alone that were controverted by in-person testimony did not constitute substantial evidence to support the Group Insurance Board's Findings of Fact and decision to terminate the claimant's benefits. As correctly pointed out by the circuit court in the present case, because most of the medical testimony is uncorroborated hearsay evidence, the Group Insurance Board's Conclusions of Law #17 and #18 that the claimant was not "totally disabled" within the contract are without support.[106] Accordingly, we reverse the decision of the

---

*ex rel. Gen. Motors Corp. v. City of Oak Creek*, 49. Wis. 2d 299, 319–20, 182 N.W.2d 481 (1971); *Bunker v. LIRC*, 2002 WI App 216, ¶¶ 15–16, 257 Wis. 2d 255, 650 N.W.2d 864.

[105] *See, e.g., Delgado v. Milwaukee Employees' Ret. Sys.*, No. 03–0758, unpublished slip op. (Wis. Ct. App. Nov. 18, 2003) (adopting *Perales*); *Local 1901–F v. Wis. Employment Relations Comm'n*, No. 01–1360, unpublished slip op. (Wis. Ct. App. Jan. 29, 2002) (adopting *Folding Furniture*); *Kennow v. Racine County*, No. 89–2220, unpublished slip op. (Wis. Ct. App. Oct. 17, 1990) (adopting *Folding Furniture*).

[106] Conclusion of Law #17:

[United Wisconsin Group] and the [Department of Employee Trust Funds] correctly applied the requirements of the ICI con-

court of appeals and affirm the order of the circuit court reversing the decision of the Group Insurance Board.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 111. LOUIS B. BUTLER, JR., J. *(concurring)*. I join the decision and mandate in this matter. I write separately to address the concerns raised by my colleagues, Justice Wilcox and Justice Prosser, about the impact that this decision will have on administrative hearings and on unrepresented claimants in those hearings.

¶ 112. Justice Wilcox writes that the residuum rule makes it more difficult for parties, particularly plaintiffs, to prove their case before an administrative body. Wilcox, J., dissenting, ¶ 145. He is concerned that many claimants will not be able to afford expert witnesses, *id,* and that as a result, the residuum rule is inherently unfair to unrepresented claimants. *Id.,* ¶ 149. Justice Prosser similarly writes that our decision will force financially struggling claimants to pay

---

tract to the documented facts pertinent to the appellant's ICI claim. In determining that the appellant was not disabled within the meaning of the contract, UWG and the DETF reasonably accepted the opinions of appellant's treating physician and of UWG's expert over that of the physical therapist, who did not have the benefit of the contractual definition, and of non-contemporaneous opinion by appellant's expert. The Board concludes that the appellant was not disabled within the requirements of the ICI contract after April 30, 1997.

Conclusion of Law #18:

In accordance with the above Findings of Fact and Conclusions of Law, the Board concludes that the DETF did not err in its July 9, 1998, determination to terminate the appellant's [income continuation insurance] benefits beyond April 30, 1997, under Section 5.14 – 4.b. of the contract effective January 1, 1995, between UWG and the Board.

the bills for expert testimony. *Id.* ¶ 196. He is also concerned about the unrepresented claimant. *Id.,* ¶ 198.

¶ 113. These are legitimate concerns. I believe, however, that these concerns are overstated. I disagree with Justice Prosser's conclusion that in the future, "participants in administrative hearings will be required to provide live, in-person testimony to corroborate reliable hearsay evidence". Prosser, J., dissenting, ¶ 201. As Justice Roggensack's dissent points out, corroboration can be introduced in a number of ways. Claimants who have a medical condition can testify as to that condition. Other witnesses can be called as well. Testimonial evidence would provide the corroboration necessary to allow a hearing examiner to consider hearsay medical reports concerning the condition. Corroboration of hearsay does not have to come from experts, but hearsay must be corroborated to constitute "substantial evidence." That is precisely what is lacking in this case.

¶ 114. I agree with Justice Roggensack that the court can look at the remainder of the evidence to see whether corroboration exists that would allow a hearing examiner to consider hearsay medical reports. I disagree with her conclusion that such corroboration exists in this case. Absent the hearsay medical reports, there is simply no evidence in the record that would corroborate a conclusion that Gehin was not disabled within the meaning of the contract.

¶ 115. For the foregoing reasons, I respectfully concur.

¶ 116. JON P. WILCOX, J. (*dissenting*). I do not join the majority opinion because I disagree that the residuum rule is applicable to this case. The majority's

161

application of the residuum rule is erroneous for several reasons. First, under the clear holding of *Richardson v. Perales,* 402 U.S. 389 (1971), the residuum rule—which posits that an administrative agency cannot base factual findings on uncorroborated hearsay—does not apply to reliable, probative, documentary evidence (particularly standard medical reports) in administrative proceedings. Further, applying the residuum rule to prohibit agencies from considering uncorroborated documentary evidence regardless of its reliability and probative value conflicts with the relaxed evidentiary standards in administrative proceedings and this court's deferential standard of review. Finally, applying the residuum rule in such a fashion will be harmful to claimants in future cases and is inconsistent with the reality of administrative proceedings.

¶ 117. The pertinent question before the court is whether uncorroborated hearsay in the form of medical reports that are contradicted by live testimony at an administrative hearing can ever constitute substantial evidence supporting an agency's factual findings. The substantial evidence rule is set forth in Wis. Stat. § 227.57(6) (2001–02),[1] which prescribes the standard to be used when reviewing agency decisions: "The court shall . . . set aside agency action or remand the case to the agency if it finds that the agency's action depends upon any finding of fact that is not supported by substantial evidence."

¶ 118. Our case law has defined substantial evidence as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Sea View Estates Beach Club, Inc. v. DOR,* 223 Wis. 2d 138,

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

148, 588 N.W.2d 667 (Ct. App. 1998) (citing *Sterlingworth Condo. Ass'n, Inc. v. DNR,* 205 Wis. 2d 710, 727, 556 N.W.2d 791 (Ct. App. 1996)).[2] This definition of substantial evidence is consistent with that employed in *Perales:* "Substantial evidence" is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Perales,* 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).[3] It is noteworthy that the definition of substantial evidence focuses on the relevancy of the evidence and how a reasonable mind might view its probative value.

¶ 119. The majority unnecessarily adds to this definition, applying the legal residuum rule that was set forth by this court in *Folding Furniture Works, Inc. v. Wisconsin Labor Relations Bd.,* 232 Wis. 170, 188–89, 285 N.W. 851 (1939). Majority op., ¶¶ 53–54, 81. As the majority correctly notes, *id.,* ¶ 54, the court in *Folding Furniture,* 232 Wis. at 189, adopted the legal residuum rule, which provides that uncorroborated hearsay cannot constitute substantial evidence, from the United States Supreme Court's decision in *Consolidated Edison,* 305 U.S. at 235.

¶ 120. However, the United States Supreme Court subsequently repudiated this interpretation of *Consolidated Edison* in *Perales,* concluding:

> The contrast the Chief Justice was drawing [in *Consolidated Edison*], at the very page cited, was not with material that would be deemed formally inadmissible in

[2] *See also ABKA Ltd. P'ship v. DNR,* 2001 WI App 223, ¶ 18, 247 Wis. 2d 793, 635 N.W.2d 168 (accord).

[3] *See also American Grain Trimmers, Inc. v. Office of Workers' Comp.,* 181 F.3d 810, 817 (7th Cir. 1999); *Leitman v. McAusland,* 934 F.2d 46, 51 (4th Cir. 1991); *Johnson v. United States,* 628 F.2d 187, 189 (D.C. Cir. 1980).

judicial proceedings but with material "without a basis in evidence having rational probative force." *This was not a blanket rejection by the Court of administrative reliance on hearsay irrespective of reliability and probative value.* The opposite was the case.

*Perales,* 402 U.S. at 407–08 (emphasis added). Thus, *Perales* held that uncorroborated hearsay *could* constitute substantial evidence in administrative proceedings if the evidence possessed sufficient indicia of reliability and probative value. *Id.* at 402. "The Supreme Court has explained that hearsay has not been rejected for consideration at administrative hearings, but only hearsay without a basis in evidence having rational probative value." *Leitman v. McAusland,* 934 F.2d 46, 51 (4th Cir. 1991).

¶ 121. Yet, the majority misconstrues *Perales,* arguing that the holding in *Perales* was unique to the context of the Social Security Administration, majority op., ¶¶ 62, 65–66, and that *Perales* is distinguishable from the present case because there supposedly was an expert that corroborated the medical reports at issue in *Perales. Id.,* ¶ 67. The majority is simply wrong on both counts.

¶ 122. The issue in *Perales* was "whether physicians' written reports of medical examinations they have made of a disability claimant may constitute 'substantial evidence' supportive of a finding of nondisability . . . when the claimant objects to the admissibility of those reports and *when the only live testimony* is presented by his side and *is contrary to the reports.*" *Perales,* 402 U.S. at 390 (emphasis added). As the *Perales* court stated: "The issue revolves, however, around a system which produces a mass of medical evidence in report form. May material of that kind ever be 'substantial evidence' *when it stands alone* and is

opposed by live medical evidence and the client's own contrary personal testimony." *Id.* at 399 (emphasis added).

¶ 123. While the hearing examiner in *Perales,* 402 U.S. at 396 did call an independent medical advisor as a witness, this witness *merely reviewed the medical reports at issue and summarized their contents,* testifying that "the consensus of the various medical reports was that Perales had a mild low-back syndrome of musculo-ligamentous origin." There is nothing in the *Perales* opinion to suggest, as the majority does, that the independent medical advisor rendered a separate opinion agreeing with the substance of the medical reports. Quite the contrary, the Court twice referred to the medical reports as standing alone and being contradicted by the live testimony. *Id.* at 390, 399. Indeed, the precise holding of *Perales* was as follows:

> [A] written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his areas of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.

*Id.* at 402.

¶ 124. In addition, contrary to the majority's argument, the rationale of *Perales* focused on the fact that the medical reports at issue were reliable and probative because they were standard reports that were routinely

utilized in administrative proceedings and the physicians who authored the reports had personally examined the claimant. *Id.* at 402–06. Therefore, the express language of *Perales* and its rationale refute the majority's attempts to sidestep the importance of that decision.

¶ 125. Rather than being a decision peculiar to the social security context, *Perales* has been recognized by other courts as "*the leading recent case dealing with the question of 'substantial evidence' in administrative decisionmaking*[.]" *Unemployment Comp. Bd. of Review v. Ceja,* 427 A.2d 631, 639 (Pa. 1981) (emphasis added).[4] Numerous other courts have applied the *Perales* holding beyond the context of social security hearings to an assortment of administrative proceedings. *See, e.g., Leitman,* 934 F.2d at 48, 51 (decision of Defense Logistics Agency that debarred plaintiff from purchasing government property under the Federal Acquisition Regulations); *Bell Helicopter Int'l, Inc. v. Jacobs,* 746 F.2d 1342, 1343–44 (8th Cir. 1984) (decision of Benefits Review Board under the Longshoremen's and Harbor Workers' Compensation Act); *Calhoun v. Bailar,* 626 F.2d 145, 146–47, 149 (9th Cir. 1980) (discharge of postal employee); *Johnson v. United States,* 628 F.2d 187, 188, 190 (D.C. Cir. 1980) (decision of the United States Civil Service Commission removing plaintiff from his position as a special agent in the Bureau of Alcohol, Tobacco, and Firearms); *Sch. Bd. of Broward Co. v. Dep't of Health, Educ. and Welfare,* 525 F.2d 900,

---

[4] The lead opinion in *Unemployment Comp. Bd. of Review v. Ceja,* 427 A.2d 631 (Pa. 1981), is cited throughout this dissent for the persuasiveness of its analysis of the residuum rule, not the weight of its authority.

166

903–04, 906 (5th Cir. 1976) (decision of Commissioner of Education that school board was not eligible for federal aid).

¶ 126. These decisions appropriately recognize that in the *Perales* decision:

> the Supreme Court . . . sanctioned the use of written reports of licensed physicians in administrative hearings, despite the hearsay character of the reports and the absence of opportunity for cross-examination. . . . Such hearsay evidence alone may therefore support an agency determination.

*Bell Helicopter,* 746 F.2d at 1344 (citations omitted). Thus, properly interpreted, *Perales* represents a landmark decision that altered the standards as to what constitutes substantial evidence in administrative proceedings:

> It is undisputed that an adjudicative official at an administrative hearing can consider hearsay. It is also clear that hearsay alone *may* not be sufficient as a substantial basis for a decision. The Supreme Court has explained that hearsay has not been rejected for consideration at administrative hearings, but only hearsay without a basis in evidence having rational probative value.

*Leitman,* 934 F.2d at 51 (citations omitted).

¶ 127. Therefore, the significance of *Perales* lies not in anything unique to the Social Security Administration, but rather in its recognition that "it is not the hearsay nature per se of the proffered evidence that is significant, it is its probative value, reliability and the fairness of its use that are determinative." *Calhoun,* 626 F.2d at 148. In other words, *Perales* "rejected a rigid rule and held that the proffered hearsay evidence could constitute substantial evidence. In doing so, the Court

167

explained that there could be no blanket rejection of administrative reliance on hearsay evidence irrespective of reliability and probative value." *Id.* at 149. In essence, *Perales* appropriately recognized that reasonable fact-finders could rely on uncorroborated hearsay that is sufficiently reliable and probative when making factual findings.

¶ 128. As such, contrary to the majority's assertion, majority op., ¶ 64, *Perales* did more than simply cast doubt on the legitimacy of the residuum rule. Courts applying the substantial evidence rule in light of *Perales* have recognized that "[a] residuum of corroborating evidence of the type admissible in a jury trial is no longer required." *Bell Helicopter,* 746 F.2d at 1344. In the aftermath of *Perales,* "[the residuum] rule no longer controls. We have rejected a per se approach that brands evidence as insubstantial solely because it bears the hearsay label." *Johnson,* 628 F.2d at 190.

¶ 129. In light of the explicit language of *Perales* and its subsequent application by other courts, I would conclude that the holding of *Perales* is applicable to the case at bar.[5] The holding of *Perales,* which focuses on the reliability and probative force of hearsay evidence, is much more congruent with Wisconsin's statutory framework for administrative proceedings than the residuum rule that the majority applies.

---

[5] Other state courts follow a similar rule, focusing on the reliability and probative value of the evidence, rather than whether it falls under the technical definition of hearsay. *See, e.g., Covell v. Dep't Soc. Servs.,* 791 N.E.2d 877, 892 (Mass. 2003) ("Substantial evidence may be based on hearsay alone if that hearsay has 'indicia of reliability' ") (quoted source omitted). *Gray v. Adduci,* 532 N.E.2d 1268, 1269 (N.Y. 1988) (hearsay can support an administrative determination if it possesses sufficient reliability and probative value).

¶ 130. Wisconsin Stat. § 227.45(1), governing administrative procedure, provides:

> Except as provided in ss. 19.52(3) and 901.05, an agency or hearing examiner *shall not be bound by common law or statutory rules of evidence.* The agency or hearing examiner shall admit all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitious testimony or evidence that is admissible under s. 901.05. . . . *Basic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact.*

(Emphasis added).

¶ 131. Importantly, the statute provides that an agency *shall not be* bound by formal rules of evidence and that the proof of facts is governed by basic principles of relevancy and probative force. This statute represents a legislative determination to relax the rules of evidence in administrative proceedings. *Wal-Mart Stores, Inc. v. LIRC,* 2000 WI App 272, ¶ 20 n.8, 240 Wis. 2d 209, 621 N.W.2d 633; *Pieper Elec., Inc. v. LIRC,* 118 Wis. 2d 92, 97, 346 N.W.2d 464 (Ct. App. 1984). In addition, Wis. Admin. Code § ETF 11.06(1) (Jan., 2004), which sets forth the evidentiary rules to be used at administrative hearings, provides: "Rules of privilege recognized by law shall be given effect. However, common law or statutory rules of evidence do not apply. The hearing examiner shall admit all testimony having a reasonable probative value. The hearing examiner shall exclude from the record irrelevant, immaterial, or unduly repetitious testimony." Contrary to the residuum rule, *Perales* is consistent with Wis. Stat. § 227.45(1) and Wis. Admin. Code § ETF 11.06(1) because it recognizes that reliable and probative uncorroborated hearsay may constitute substantial evidence supporting an agency's factual finding.

169

¶ 132. The residuum rule is incongruent with § 227.45(1) for several reasons. First, by prohibiting an agency from considering uncorroborated hearsay, the residuum rule forces an agency to follow formal rules of evidence. An administrative agency operating under the residuum rule must make two determinations: 1) whether the evidence is hearsay and 2) whether the evidence is corroborated. The first of these inquiries is very problematic in light of the statutory framework. "Hearsay" is defined by the rules of evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Wis. Stat. § 908.01(3).

¶ 133. Thus, at the outset, when operating under the residuum rule, it is necessary to turn to the rules of evidence to determine whether a particular piece of evidence constitutes hearsay. "Evidence is 'hearsay' *only* if all elements of the definition are satisfied." 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence* § 801.1, at 521 (2d ed. 2001) (emphasis added). That is, to constitute hearsay under the statutory definition, there must be: 1) a declarant; 2) who offers a statement; 3) that is made out of court; and 4) is offered for the truth of the matter asserted. If a piece of evidence fails to meet *any* one element, then it is not hearsay. *Id.,* § 801.1, at 522. Specifically, "[o]ut of court statements may be offered to prove innumerable relevant propositions apart from the truth of the matter (explicitly) asserted." *Id.,* § 801.3, at 536. This recognition is extremely important because "[i]f the statement is being offered to prove anything other than the truth of the matter asserted, it is not 'hearsay.' " *Id.,* § 801.3, at 534.

¶ 134. In addition to having to consider this technical definition of hearsay, an agency operating under

the residuum rule will have to contend with the fact that Wis. Stat. § 908.01(4) sets forth two categorical *exemptions* from the hearsay rule. Section 908.01(4) provides that prior statements of witnesses and admissions by party opponents are not hearsay. Each of these exemptions, in turn, has numerous technical elements that must be satisfied.[6] Therefore, an agency operating under the residuum rule must necessarily violate both the express language of § 227.45(1) and the spirit of relaxed evidentiary standards in administrative proceedings because it must make technical evidentiary determinations in order to decide whether an item of evidence is hearsay.

¶ 135. Furthermore, the residuum rule is inconsistent with that part of § 227.45(1) which provides that "[b]asic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact" because it fails to take into account that some uncorroborated hearsay is relevant and probative. The residuum rule represents a classic case of evaluating form over substance. The residuum rule fallaciously assumes

---

[6] Several published administrative decisions indicate that administrative agencies must routinely grapple with these technical evidentiary distinctions in proceedings that by statute are supposedly subject to relaxed evidentiary standards. *See, e.g., Wicke v. Merrill Area Pub. Sch.,* No. 2002–014249 (May 7, 2004) (available at http://www.dwd.state.wi.us/lirc/wcdecsns/812.htm) (applying party opponent and prior inconsistent statement hearsay exemptions); *Hunter v. Racine Unified Sch. Dist.,* No. 01605072RC (Oct. 3, 2001) (available at http://www.dwd.state.wi.us/lirc/ucdecsns/1204.htm) (applying hearsay definition and business records exception to hearsay rule); *Albrecht v. Life Style Staffing of Appleton,* No. 98401933AP (Oct. 5, 1998) (available at http://www.dwd.state.wi.us/lirc/ucdecsns/811.htm) (applying hearsay definition and determining whether evidence at issue fell within business records exception to hearsay rule).

that all hearsay, including all documentary evidence, is inherently unreliable and applies a categorical bar to the consideration of uncorroborated hearsay, rather than allowing for a case-by-case analysis of the actual reliability and probative value of individual pieces of evidence. The residuum rule fails to recognize that corroboration does not equal reliability and that some forms of hearsay may be reliable and probative despite their lack of corroboration.

¶ 136. In sum, the inherent problem with the residuum rule is as follows:

> [It] fails to distinguish between reliable and unreliable hearsay, thus hampering the administrative decision-making process; while it equally fails to thoroughly protect due process rights, because unobjected to hearsay, no matter how unreliable, if corroborated, no matter how slight the legal evidence, may provide the substantial evidence needed to support an administrative finding. Corroboration in and of itself is not dispositive of the issue of reliability. If available, corroboration may be a factor in determining reliability, but corroboration or the lack thereof neither ensures nor precludes reliability. The standard is, therefore, at the same time too rigid and too indefinite.

*Ceja,* 427 A.2d at 638.

¶ 137. It is simply inconsistent with § 227.45(1) to argue that all uncorroborated hearsay, no matter what its relevance or probative value, is categorically insufficient to allow a reasonable mind to base a factual conclusion upon it. "Any evidence, whether corroborated or not, if relevant and reliable, should be capable of supporting a factual finding." *Ceja,* 427 A.2d at 643.[7]

[7] Likewise, I would conclude that Wis. Admin. Code § ETF 11.12(2)(a)(Jan., 2004) is invalid because it conflicts with Wis.

¶ 138. The *Perales* decision allows uncorroborated hearsay to constitute substantial evidence if it bears sufficient indicia to "assure underlying reliability and probative value." *Perales,* 402 U.S. at 402. This standard for substantial evidence, contrary to the residuum rule, comports with the prescription in § 227.45(1) that "[b]asic principles of relevancy, materi-

---

Stat. § 227.45(1). Section ETF 11.12(2) sets forth the standards an agency must utilize when drafting final decisions. Regarding findings of fact, § ETF 11.12(2)(b) provides, in pertinent part: "No finding of fact may be based upon hearsay." Generally, an administrative rule that conflicts with an unambiguous statute is invalid. *Wis. Citizens Concerned for Cranes and Doves v. DNR,* 2004 WI 40, ¶ 14, 270 Wis. 2d 318, 677 N.W.2d 612. "In those cases in which a conflict arises between a statute and an administrative rule, the statute prevails." *Seider v. O'Connell,* 2000 WI 76, ¶ 72, 236 Wis. 2d 211, 612 N.W.2d 659.

The administrative rule conflicts with the statute in two ways. First, as described above, it requires the agency to resort to the rules of evidence in order to determine whether an item of evidence is hearsay, contrary to the statement in § 227.45(1) that an administrative agency is not bound by the formal rules of evidence. Second, the rule on its face prohibits reliance on *all* hearsay, not simply uncorroborated hearsay. Because the rule fails to account for the fact that some hearsay, especially hearsay that is corroborated or that falls within a recognized exception, may be relevant and probative, it is inconsistent with that part of § 227.45(1) which provides that "[b]asic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact." Wis. Stat. § 227.45(1).

Notably, the majority fails to discuss this rule at length, despite the fact that on its face, it is broader than the residuum rule. The residuum rule prohibits factual findings based on uncorroborated hearsay. Section ETF 11.12(2)(b) goes one step further by requiring that "[n]o finding of fact may be based upon hearsay."

ality and probative force shall govern the proof of all questions of fact" in administrative proceedings.

¶ 139. While the majority argues that without corroboration, hearsay is categorically not probative, majority op., ¶¶ 89–91, it also recognizes that hearsay is admissible in administrative proceedings. *Id.,* ¶¶ 49–51, 86. These two conclusions represent a misunderstanding of the requirements of admissibility in Wisconsin and the relation between probative value and relevance. Wisconsin Stat. § 904.02 provides that "[a]ll relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." Wisconsin Stat. § 904.01, in turn, defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Relevance under the Wisconsin rules, then, conflates the probative value of the evidence (the link between the evidence and the proposition to be proven) and the question whether the substantive law regards this proposition as one "of consequence[.]" 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence* § 401.1, at 81 (2d ed. 2001).[8] "Only where the evidence lacks any probative value should it be excluded as 'irrelevant.' " *Id.,* § 401.102, at 87. "[T]he probative value of the evidence . . . is a function of its relevance under § 904.01." *Id.,* § 403.1, at 113. "Probative value, then, is the product of relevance and an assessment of what the evidence adds to the case." *Id.,* § 403.1, at 114.

---

[8] Thus, evidence is probative if it "tends to prove or disprove a point in issue." *Black's Law Dictionary* 579 (7th ed. 1999).

174

¶ 140. As such, evidence must have some probative value to be admitted in the first instance. This is explicitly recognized in § 227.45(1), which provides that "[t]he agency or hearing examiner shall admit all testimony having reasonable probative value . . . ." Once evidence is properly admitted, it necessarily contains some probative value. Thus, it is entirely incorrect to posit that uncorroborated hearsay, as a category, lacks *any* probative value once properly admitted.

¶ 141. However, this does not mean that simply because evidence has sufficient probative value to be admitted, it automatically constitutes "substantial evidence." *See Calhoun,* 626 F.2d at 150 ("[H]earsay admitted without objection is ordinarily given its normal probative effect."). Rather, the definition of substantial evidence requires an evaluation of *how much* probative value a given piece of evidence possesses. *See Johnson,* 628 F.2d at 190–91 (noting that the *Perales* rule calls for an evaluation of "the weight each item of hearsay should receive according to the item's truthfulness, reasonableness, and credibility"). In other words, a given piece of evidence constitutes substantial evidence if it possesses a degree of probative value sufficient to allow "a reasonable mind [to] accept [it] as adequate to support a conclusion." *Sea View Estates Beach Club,* 223 Wis. 2d at 148. *See also Gray v. Adduci,* 532 N.E.2d 1268, 1269 (N.Y. 1988) ("The quantum of evidence before the Administrative Law Judge was substantial since a reasonable mind could accept the report as 'adequate to support a conclusion or ultimate fact.'") (quoted source omitted); *Black's Law Dictionary* 1442 (7th ed. 1999) (The "substantial-evidence rule" is "[t]he principle that a reviewing court should uphold an administrative body's ruling if it is supported by evidence on which the administrative body could reason-

ably base its decision."). Under the residuum rule, an agency is never allowed to consider and weigh the probative value or reliability of a given piece of uncorroborated hearsay.

¶ 142. In addition, the notion that all forms of hearsay are intrinsically unreliable is flawed because it fails to account for the fact that hearsay subject to a recognized exception is inherently reliable. While the majority states that "[h]earsay that is subject to an exception is still hearsay," majority op., ¶ 89, this observation misses the point. Each hearsay exception under the rules of evidence "represents a determination of categorical reliability; that is, hearsay falling within any one of the rules carries with it guarantees of trustworthiness and reliability comparable to in-court testimony." 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence* § 801.1, at 523 (2d ed. 2001). *See also Ceja,* 427 A.2d at 640–41 ("Once evidence is admitted under a recognized exception . . . the evidence is given full probative weight."). By placing an absolute bar on the consideration of uncorroborated hearsay, the majority ignores the fact that certain types of hearsay are categorically considered reliable and trustworthy, despite lack of corroboration.

¶ 143. In addition, the *Perales* rule, "which requires administrative consideration of probative value and reliability in the first instance comports with . . . the limited review of administrative actions." *Calhoun,* 626 F.2d at 149–50. Regarding agency factual findings, the legislature has provided that "the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact." Wis. Stat. § 227.57(6). By focusing on whether an item of evidence is sufficiently reliable and probative for a reasonable fact-finder to form a conclusion based on the

176

evidence, the *Perales* decision is in harmony with this deferential standard of review for factual findings that the legislature has provided.[9] In contrast, the majority has essentially substituted its judgment for all agencies by concluding that uncorroborated hearsay, no matter how reliable or probative, can never support a factual finding.

¶ 144. In addition to being inconsistent with the statutory framework for administrative hearings, application of the residuum rule to reliable, probative, documentary evidence is substantially unfair to claimants in administrative proceedings. Because the residuum rule requires corroboration of hearsay in all cases, regardless of the probative value or reliability of a given piece of evidence, "the effect of the residuum rule is to create an evidentiary standard actually stricter than that adhered to in jury trials." *Ceja,* 427 A.2d at 636. In contrast, the *Perales* decision allows for "the full development of the record." *Calhoun,* 626 F.2d at 150.

¶ 145. As the residuum rule imposes an evidentiary standard stricter than in jury trials, it does not afford "protection for the parties[,]" majority op., ¶ 90, in administrative proceedings. Quite the contrary, the residuum rule makes it more difficult for parties, particularly claimants, to prove their case before an administrative body. The majority recognizes that many claimants in administrative proceedings are unrepre-

___

[9] The majority states that the "legal residuum rule is supported by the notion that courts should act as a check on the agencies by reviewing the decisions for fundamental fairness." Majority op., ¶ 59. However, under the standard of review prescribed by the legislature, a court may review an agency decision for fairness only in relation to the *procedures* utilized by the agency. Wis. Stat. § 227.57(4).

sented. Majority op., ¶ 51. Yet, by subjecting these unrepresented claimants to the requirements of the residuum rule, the majority forces them to operate under the intricacies of the hearsay rule and its exemptions. The majority also recognizes that many claimants cannot afford expert witnesses and need to be able to present their position as simply and inexpensively as possible at a hearing. Majority op., ¶¶ 102–03. However, it fails to recognize that the residuum rule cuts both ways and applies to all parties in administrative proceedings.

¶ 146. The majority implies that the residuum rule may not be applicable if harmful to a claimant by stating that "[c]orroboration of hearsay is not always required in administrative proceedings." Majority op., ¶ 104. However, the majority offers absolutely no authority for this inexplicable conclusion, which flies in the face of the remainder of the opinion. The majority theorizes that parties may stipulate to the facts or agree that an agency may base its findings of fact on uncorroborated hearsay. *Id.* One has to wonder why a defendant in an administrative proceeding, which usually will possess greater resources and the ability to call experts, would ever stipulate to facts if the claimant is unable to produce live testimony.

¶ 147. In addition, the majority's suggestion that the parties can somehow agree that an agency can base its findings on hearsay runs contrary to the agency's own rule, which purportedly prohibits the agency from basing factual findings upon hearsay. Wis. Stat. § ETF 11.12(2)(b) (Jan., 2004). The majority has cited no case or principle of law that stands for the proposition that parties can agree to have an agency violate its own rules in rendering decisions. In sum, while the majority's comments in ¶¶ 103–04 imply that the residuum rule

178

does not apply when its operation would be adverse to claimants, the reality is that no case stands for this proposition and that the residuum rule will apply equally to all claimants and defendants.

¶ 148. Furthermore, the rule the majority applies today extends well beyond claims for income continuation insurance benefits and imposes an artificially high evidentiary bar in a variety of administrative proceedings. While the result of the majority's decision may be beneficial to the claimant in the present case, the rule the majority adopts will harm countless claimants in this and other contexts because it imposes an evidentiary standard stricter than that in jury trials. To add insult to injury, the majority imposes a standard of corroboration that is stricter than that which is required during criminal trials. *Id.,* ¶¶ 92–101.

¶ 149. If the majority were truly concerned with "fairness," *id.,* ¶ 82, it would recognize that the residuum rule, which requires an understanding of the technicalities and nuances of evidence law, is inherently unfair to unrepresented claimants. In contrast, the *Perales* decision, which allows parties to submit all of the evidence they consider relevant to the fact-finder for consideration, and then requires the fact-finder to evaluate each piece of evidence individually for reliability and probative value, is both consistent with principles of equity and the relaxed evidentiary standards that are, by statute, supposed to govern administrative proceedings.

¶ 150. Finally, the majority's application of the residuum rule to standard medical reports ignores the reality of administrative proceedings. The majority implies that medical reports prepared in connection with potential litigation are unreliable. Majority op., ¶¶ 69–71, 86. However, the reports at issue in *Perales,*

402 U.S. at 402–04, were also prepared by experts retained by the government in connection with litigation. In determining that the medical reports before it constituted substantial evidence, the Supreme Court in *Perales* examined numerous factors, 402 U.S. at 402–06, several of which are applicable in the present case, stressing that "[t]hese are routine, standard, and unbiased medical reports by physician specialists concerning a subject whom they had seen." *Perales*, 402 U.S at 404. Thus, *Perales* "laid great stress on the fact that the reports were independent medical reports routinely prepared and submitted in disability cases." *Calhoun*, 626 F.2d at 149.

¶ 151. As such, *Perales* recognized the reality that administrative agencies routinely rely on reports prepared by experts who have examined claimants, and that such reports are probative and reliable. The *Perales* court "specially noted, first, that the fact that the government calls in and remunerates consultative physicians does not undermine the independence of those physicians' opinions or indicate bias in favor of the [agency] . . . ." *Allen v. Heckler*, 749 F.2d 577, 580 (9th Cir. 1984).

¶ 152. *Perales* correctly recognized that documentary evidence, especially medical reports, are routinely utilized in administrative proceedings. Indeed, the Wisconsin Legislature has acknowledged the importance of such evidence in the context of the Workers' Compensation Law by providing that certified reports of medical institutions and practitioners who have examined a patient constitute prima facie evidence as to the matters contained in the reports. Wis. Stat. § 102.17(1)(d). Administrative proceedings are designed to allow for the efficient and fair resolution of claims without the formalities and intricate rules of a full judicial proceed-

ing before a court. By requiring live testimony in every case and preventing agencies from considering evidence that is commonly utilized by parties, the majority ignores this reality and frustrates the purpose of administrative hearings.

¶ 153. For the aforementioned reasons, I respectfully dissent.

¶ 154. I am authorized to state that Justice DAVID T. PROSSER, JR. joins this opinion.

¶ 155. DAVID T. PROSSER, J. (*dissenting*). Luann Gehin is a sympathetic figure, but her victory in this court comes at a heavy cost. My purpose in this dissent is to illuminate that cost.

¶ 156. The dissent is divided into three parts. Section I laments the majority's decision to take Wisconsin out of the mainstream of administrative law and predicts some of the consequences that will flow from the decision. Section II challenges the majority's interpretation of a key piece of evidence in the record. Section III outlines the majority's disturbing disregard of the waiver issue and the standard procedures of the Wisconsin Group Insurance Board.

I

¶ 157. In *Richardson v. Perales*, 402 U.S. 389 (1971), the Supreme Court held that written reports prepared by physicians who have examined a claimant for disability insurance benefits under the Social Security Act constitute "substantial evidence" supporting a finding of non-disability, notwithstanding the hearsay character of the reports, the absence of cross-examination (through the claimant's failure to exercise subpoena rights), and directly opposing testimony by

the claimant and the claimant's medical witness. This landmark decision validated reliance on *some* uncorroborated hearsay evidence in administrative proceedings by taking into account the nature of the proceedings, "the reliability and probative worth of written medical reports," and the claimant's unutilized opportunity for cross-examination. The decision seriously undercut the validity and scope of the so-called legal "residuum rule."

¶ 158. The majority opinion in this case represents a frontal assault on the holding in *Perales*. The opinion adheres to the precepts of the residuum rule despite a growing body of contrary decisions and the modern trend in scholarship advocating the rule's abolition.

¶ 159. The residuum rule provides, in essence, that "uncorroborated hearsay alone does not constitute substantial evidence [in administrative proceedings]." Majority op., ¶ 56. In other words, there must be some "residuum" of non-hearsay evidence upon which an agency bases its factual findings.

¶ 160. The better rule, as many courts and scholars now recognize, is that hearsay evidence may constitute substantial evidence in administrative proceedings if the hearsay evidence bears inherent guarantees of reliability and trustworthiness.

¶ 161. Wigmore's treatise on evidence asserts that: "The residuum rule . . . is decidedly not the wise and satisfactory rule for general adoption." John Wigmore, 1 *Wigmore on Evidence* § 4b at 122 (Tillers rev. 1983) (hereinafter *Wigmore*). The majority admits that the residuum rule "has been criticized by commentators" because it "ignores the reliability of evidence incompetent under the hearsay rule." Majority op.,

¶ 60. The wisdom behind these criticisms is manifest. As the *Wigmore* treatise summarizes:

> Plausible as the residuum rule seems from the liberal point of view, it is not acceptable. . . . [T]he residuum rule rests logically on [a] fallac[y] . . . that this "residuum of legal evidence," which is to be indispensable, will have some necessary relation to the truth of the finding. But the "legal" rules have no such necessary relation. In the mass, they do tend to secure a reliable body of evidence; but, taking each rule individually, it is obviously fallacious to assume that one or more pieces of "legal" evidence are per se a sufficient guarantee of truth.

*Wigmore, supra,* at 120–21.

¶ 162. To illustrate this point, consider two potential pieces of evidence. First, consider the medical reports by Dr. Whiffen and Dr. Lemon in this case, recalling that Dr. Whiffen was Gehin's treating physician. Second, consider oral testimony from someone like a claimant's spouse that the claimant is "totally disabled." The majority opinion concludes that because the latter evidence is "legal," it may serve as substantial evidence, but because the medical reports are technically "hearsay," they may not. Does this make sense? As Wigmore's treatise points out,

> [B]oth may be true, or both may be false; truth or falsity depends on the circumstances in each case. But truth or falsity does *not* depend on the one type of evidence being "legal" and the other being "illegal" . . . . Yet the rule for a "residuum of legal evidence" rests on the assumption that the "legal" evidence is *always* credible and sufficient but the "illegal" evidence is *never* credible or sufficient.

*Wigmore, supra,* at 122.

¶ 163. In 1971 the Supreme Court decided that the residuum rule does not apply to social security disability proceedings in which the agency relies on medical records. The Court said:

> We conclude that a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, *despite its hearsay character* and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, *may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant,* when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.

*Perales,* 402 U.S. at 402 (emphasis added).

¶ 164. As courts fell into line behind the *Perales* approach,[1] Wigmore's treatise noted: "The residuum

---

[1] *See, e.g., Compton v. D.C. Bd. of Psychology,* 858 A.2d 470, 476 (D.C. 2004) (hearsay alone can be substantial evidence if reliable); *Cole v. Driver and Motor Vehicle Servs. Branch,* 87 P.3d 1120, 1123 (Or. 2004) (Oregon has "expressly rejected" the residuum rule, and "hearsay evidence alone, even if inadmissible in a civil or criminal trial, is not incapable of being 'substantial evidence' "); *49th Street Mgmt. Co. v. N.Y.C. Taxi & Limousine Comm'n,* 716 N.Y.S.2d 391, 394 (App. Div. 2000) (Hearsay "may constitute substantial evidence where it is sufficiently relevant and probative.").

The Florida court of appeals, although noting that "in Florida, the residuum rule is statutory," admitted that the rule "has now been rejected in most jurisdictions and most scholars are highly critical of it." *Bellsouth Advertising & Pub. Corp. v. Unemployment Appeals Comm'n,* 654 So. 2d 292, 295 (Fla. Dist. Ct. App. 1995).

rule generally has been abandoned." *Wigmore, supra,* at 122. The National Judicial College predicted that even in jurisdictions still favoring the residuum rule, "any evidence that an Administrative Law Judge finds to be trustworthy and reliable should meet the exception to the hearsay rule and thus satisfy the legal residuum rule in those jurisdictions that apply the rule." Melvin Goldberg, *Goldberg's Deskbook on Evidence for Administrative Law Judges,* IV-16 (1993) (published in cooperation with the National Judicial College).[2] The majority opinion bludgeons this prediction.

¶ 165. Wigmore's treatise further notes that the residuum rule has been replaced by the "substantial evidence" standard. *Wigmore, supra,* at 122–23. In Wisconsin, the "substantial evidence" test is statutory. Wis. Stat. § 227.57(6) ("The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."). Wisconsin courts evaluate whether "reasonable minds could arrive at the same conclusion as the agency." *Kitten v. DWD,* 2002 WI 54, ¶ 5, 252 Wis. 2d 561, 644 N.W.2d 649. "Many courts and almost all scholars agree that hearsay and other 'incompetent' evidence may constitute 'substantial evidence.' " *Wigmore, supra,* at 123–24.

¶ 166. Despite the modern trend against the residuum rule, Wigmore's treatise admits that "[s]ome courts . . . have effectively subverted the original purpose of the substantial evidence standard by holding

---

[2] This standard parallels the court of appeals' approach: that the hearing examiner may rely on any evidence admissible under a hearsay exception, such as Wis. Stat. § 908.03(6m). *Gehin v. Group Ins. Bd.,* No. 03–0226, unpublished slip op., ¶ 14 (Wis. Ct. App. Oct. 2, 2003).

that hearsay evidence in and of itself cannot constitute 'substantial evidence.' " *Wigmore, supra,* at 124–25.

¶ 167. The approach advocated by Wigmore's treatise and approved by the Supreme Court in *Perales* could hardly be more apposite to this case. In fact, the *Perales* Court resolved exactly the same issue we face today—namely, whether written medical reports by licensed physicians may constitute substantial evidence in administrative proceedings. The Supreme Court held that medical reports do constitute substantial evidence. Today the majority holds that they do not. I would follow *Perales,* not because we are *bound* to do so, but because the reasoning behind the Supreme Court's decision, coupled with the modern trend of authority and scholarship, convinces me that we *should* do so.

¶ 168. The *Perales* Court cited nine factors it believed established the inherent reliability of the medical records in that case. Most, if not all, are present in this case as well.

¶ 169. First, the Court noted that each hearsay medical report was prepared by a practicing physician who had examined the claimant. *Perales,* 402 U.S. at 402. The Court refused to "ascribe bias" to any of these doctors. *Id.* at 403. In the present case, the medical reports relied on by the Board—that is, the Whiffen and Lemon reports—were prepared by medical doctors who examined Gehin *at the time of the disability determination.* Some reports were prepared by Gehin's own physician (Whiffen). By contrast, Dr. Shannon's examination of the claimant came two years after the determination at issue. Ironically, the relevance of Dr. Shannon's testimony, which was contested at the hearing, depended in large part upon the written "hearsay"

reports of others. There is no reason for this court to ascribe bias to the medical reports relied on by the Board.

¶ 170. Second, the *Perales* court cited the impartiality of the administrative agency evaluating the claim. *Id.* at 403. Similarly, in this case, there is nothing in the record to cause this court to believe that the Wisconsin Group Insurance Board (the Board), which employed a hearing examiner to conduct a hearing and review evidence, was biased.

¶ 171. Third, the Court hailed the process by which medical reports are generated.

> One familiar with medical reports and the routine of the medical examination, general or specific, will recognize their elements of detail and of value. The particular reports of the physicians who examined [the claimant] were based on personal consultation and personal examination and rested on accepted medical procedures and tests.

*Id.* In the present case, the majority has not suggested that the character of medical reports is today less reliable than it was at the time the Supreme Court decided *Perales.* Accordingly, that factor is also present here.

¶ 172. Fourth, the Court cited the range of examinations to which the claimant submitted. *Id.* at 404. In this case, Gehin's examinations were relatively similar, with each designed to determine whether Gehin was "totally disabled" within the meaning of the ICI policy. Concededly, the fourth *Perales* justification is not present in this case.

¶ 173. Fifth, the Court noted the consistency among all the medical reports. *Id.* In this case, the majority goes to some lengths to show that hearsay

187

cannot be corroborated by other hearsay, majority op., ¶¶ 92–101, thus rejecting consistency between independent medical reports as evidence showing the reliability of such reports. This conclusion is hard to defend.

¶ 174. Sixth, the Court noted that the claimant had the opportunity to cross-examine the doctors by requesting subpoenas for them, but did not do so. *Perales,* 402 U.S. at 404–05. Gehin had the same opportunity. The majority cites a treatise by Professor Bernard Schwarz stating that claimants rarely subpoena physicians due to the expense. Majority op., ¶ 84 n.88. But that is exactly what the majority's opinion will force claimants to do. Claimants will have to foot the bill for their own experts to appear in person, if the opposing party makes an expected objection to "hearsay" medical reports.

¶ 175. Seventh, the Court noted that even in formal trials before competent courts, medical records are admitted and considered despite their hearsay character, as an exception to the hearsay rule. *Id.* at 405. The same is true in Wisconsin. *See* Wis. Stat. § 908.03(6m).

¶ 176. Eighth, the Court noted that prior decisions have recognized the "reliability and probative value" of medical reports. *Perales,* 405 U.S. at 405. The Court found that these decisions "demonstrate traditional and ready acceptance of the written medical report in social security disability cases." *Id.* at 406. Although the Court referenced social security disability cases, the character of the medical report does not change based on the type of administrative proceeding in which it is used. Rather, the character of the report is grounded in the process used to generate the report. *See id.* at 403–04.

¶ 177. Ninth, the Court recognized the sheer magnitude of the administrative process, and reasoned that requiring live testimony by doctors would "be a substantial drain" both financially and on the energy of physicians. *Id.* at 406. Both reasons apply here as well.

¶ 178. Commentators in the wake of the *Perales* decision approved the Court's change in focus from a per se rule that hearsay cannot be substantial evidence to an evaluation of the reliability of the hearsay evidence. "Such a direct look at the reliability of the evidence makes far more sense than a per se rule that hearsay cannot be substantial evidence." *The Supreme Court, 1970 Term,* 85 Harv. L. Rev. 38, 328 (1971–72) (citing 2 K. Davis, *Administrative Law,* §§ 14.10, 14.11 (1958); I J. Wigmore, *Evidence* § 4(b)(3d ed. 1940)).

¶ 179. Hearsay rules originally developed as protections in the jury trial context to preclude laypersons from placing too much evidence on arguably unreliable hearsay evidence. *Id.* at 329 (citing Thayer, *Preliminary Treatise on Evidence at the Common Law* 180, 181 (1896); I J. Wigmore, *Evidence* § 4(b) (3d ed. 1940)). That concern is not present in administrative hearings. "[W]here the jury is supplanted by a trained hearing examiner[3] or administrative board, often with expertise in evaluating evidence, the rationale for the use of hearsay standards disappears." *Id.*

¶ 180. The Court decided *Perales* 33 years ago. Since then, many courts have relied on its reasoning. Today this court becomes one of the few, if not the only,

[3] The hearing examiner is required to "perform all functions in an impartial manner. An examiner shall disqualify himself or herself with respect to a particular appeal if . . . he or she is unable to act fairly or impartially." Wis. Admin. Code § ETF 11.04(3).

court to disagree substantively with the rationale and rule of law announced in *Perales*.

¶ 181. The majority provides several reasons for distinguishing *Perales,* majority op., ¶ 66, none of which withstands close examination. First, the majority distinguishes *Perales* based on the vast scope of the Social Security Administration (SSA). Majority op., ¶ 66. The majority cites a 1992 law review article which stated that the SSA considers more than one million disability applications a year. Majority op., ¶ 66. However, this figure of "one million . . . applications" is irrelevant. The relevant consideration is the number of cases involving a contested hearing. At the time of the Supreme Court's decision, the SSA conducted only 20,000 claim hearings annually—a number one-fiftieth the size of the amount the majority uses as justification. *Perales,* 402 U.S. at 406. Our record does not reveal how many cases the Wisconsin Group Insurance Board considers each year, so that there is no way to compare the scope of the two programs.

¶ 182. In any event, although the Supreme Court noted the scope of the SSA as one of the nine reasons supporting its holding, *id.,* this scope was not the principal reason for its decision. As the Court put it:

> The matter comes down to the question of the procedure's integrity and fundamental fairness. We see nothing that works in derogation of that integrity and of that fairness in the admission of consultants' [medical] reports, subject as they are to being material and to the use of the subpoena and consequent cross-examination.

*Id.* at 410.

¶ 183. The Court was ultimately persuaded by the "underlying reliability and probative value" of the medical reports, not by the sheer scope of the SSA. This

makes sense, because *if* the only goal were to make it easy to process an immense number of claims quickly, the practical approach would be to give the decision-maker broad autonomy to dispose of claims quickly. Instead, the Court wisely promulgated a rule based on the underlying reliability and probative value of the medical reports.

¶ 184. Second, the majority distinguishes *Perales* because in claim hearings before the SSA (at issue in *Perales*), "most claimants are not represented by counsel." Majority op., ¶ 66. Later in the opinion, the majority poses an excellent question:

> [I]f hearsay is admissible in court as an exception to the hearsay rule and a fact-finder in a judicial proceeding may base its decision on admissible hearsay, why then apply what appears to be a more restrictive rule barring an administrative agency from basing its decision on uncorroborated hearsay that falls within a hearsay exception?

Majority op., ¶ 90.[4]

---

[4] The majority's question is well taken because Wis. Stat. § 227.45(1) provides in part that in agency proceedings, "Basic principles of relevancy, materiality and probative force shall govern the proof of all questions of fact." Generally, § 227.45 relaxes evidentiary standards in administrative proceedings. *Accord Wal-Mart Stores, Inc. v. LIRC,* 2000 WI App 272, ¶ 20 n.8, 240 Wis. 2d 209, 621 N.W.2d 633. The majority's decision today *increases* the standards for reliance on hearsay in administrative proceedings beyond even the standard employed in criminal cases, as the majority admits. *See* majority op., ¶ 90.

The majority steadfastly contends that "the relaxed evidentiary standard is not meant to allow the proceedings to degenerate to the point where an administrative agency relies only on unreliable evidence." Majority op., ¶ 51. Apparently, the majority characterizes medical records as "unreliable evidence." This

¶ 185. The majority answers its own question by stating that the "primary reason" for imposing stricter evidentiary standards on administrative agencies than on criminal courts is that "in administrative hearings the claimants are often not represented by counsel . . . ." *Id.* In this case, however, Gehin was represented by counsel, the hearing examiner was an attorney, and the Group Insurance Board collectively had substantial experience and expertise. Thus the facts were similar to the facts in *Perales.* Imposing an evidentiary standard for administrative hearings higher than the standard applied in courts does not assist a person who is *not* represented by counsel.

¶ 186. Third, the majority distinguishes *Perales* because "procedures must be kept as simple and inexpensive as possible for the system to work." Majority op., ¶ 66. This is really just a restatement of the majority's first ground for distinguishing *Perales*—the scope of the SSA. As already discussed, that was not the impetus behind the Supreme Court's holding. The majority provides no reason that proceedings before the Group Insurance Board should not also be simple and inexpensive.

---

is odd, given this court's adoption of an evidentiary rule expressly providing for the admission of health care provider records despite their hearsay character, Wis. Stat. § 908.03(6m), the Supreme Court's holding and accompanying reasoning in *Perales,* and the holding of this court in *Hagenkord v. State,* 100 Wis. 2d 452, 469–71, 302 N.W.2d 421 (1981) extolling the reliability of medical records. Yielding slightly, the majority later admits that "Medical reports arguably have indicia of reliability . . . they are furnished by independent, impartial experts. . . ." Majority op., ¶ 69.

¶ 187. The majority also distinguishes *Perales* on factual grounds because in that case "the doctors' written reports were corroborated by in-person testimony. The evidence in *Perales* consisted of [the written medical reports, oral testimony for the claimant, and] a government-paid doctor's testimony that corroborated the substance of the written hearsay reports." Majority op., ¶ 67. This summarization overstates what the "government-paid doctor" actually did. The government-paid doctor never examined the claimant. *Perales,* 402 U.S. at 396. He simply summarized the hearsay medical reports, and provided the hearing examiner with a "consensus" of the medical reports. *Id.* In effect, he explained to the examiner what the medical reports said.

¶ 188. In the case at bar, the Group Insurance Board examiner had the benefit of the detailed forms completed by the doctors. The examining doctors had to answer a simple question: Is Luann Gehin "totally disabled" within the meaning of the ICI policy? The doctors simply checked "yes" or "no" after providing their findings and reasoning. The examiner did not need another medical doctor to provide the "consensus" of these reports. The examiner could simply count how many doctors answered "yes" and how many answered "no."

¶ 189. Instead of relying on *Perales,* a Supreme Court case directly on point, the majority chooses to rely on *Folding Furniture Works, Inc. v. Wisconsin Labor Relations Board,* 232 Wis. 170, 285 N.W. 851, 286 N.W. 875 (1939). It thereby disregards the remarkable similarity of the factual situation in *Perales* and turns to the fundamentally different factual situation in *Folding Furniture.*

193

¶ 190. *Folding Furniture* is a case about unfair labor practices in the context of collective bargaining between a labor union and an employer. 232 Wis. at 178–79. The employer in *Folding Furniture* objected to the Wisconsin Labor Relations Board's admission of and reliance on employee testimony about what the owner's motivation was in certain statements he made and actions he took and what the owner's sons' opinion was about wage increases. *Id.* at 188. Statements such as these fall within the heart of the prohibition on hearsay. *See* Wis. Stat. §§ 908.01(3) (definition of hearsay), 908.02 (hearsay inadmissible unless otherwise excepted from the general rule). In the instant case, the evidence at issue is not oral statements by laypersons of "mere opinion," but medical reports prepared by doctors after personal examinations. This court has already ratified the trustworthiness inherent in medical reports by expressly exempting "Health Care Provider Records" from the operation of the general rule prohibiting hearsay. Wis. Stat. § 908.03 preamble and (6m).[5]

¶ 191. Despite the factual differences, the majority cites *Folding Furniture* because it quotes the United States Supreme Court opinion in *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197 (1938), which stated "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Id.* at

---

[5] The majority contends that medical reports "arguably have indicia of reliability and therefore seem to have probative force," majority op., ¶ 69, but refuses to decide whether the reports are actually admissible. Majority op., ¶ 89. The plain language of § 908.03(6m) provides that "records" prepared by a "health care provider" are admissible. It is difficult to imagine how the medical reports in this case would not fall within the scope of that rule. *See generally Hagenkord,* 100 Wis. 2d at 469–71.

194

230. In *Folding Furniture,* this court did not analyze the statement from *Consolidated Edison,* but merely quoted it. *See Folding Furniture,* 232 Wis. at 189.

¶ 192. Had *Perales* not addressed this language from *Consolidated Edison,* this court might have reason to struggle with the two cases. But it need not do so because the *Perales* Court expressly clarified and distinguished the quoted statement from *Consolidated Edison:*

> The contrast the Chief Justice was drawing, at the very page cited, was not with material that would be deemed formally inadmissible in judicial proceedings but with material "without a basis in evidence having rational probative force." *This was not a blanket rejection by the Court of administrative reliance on hearsay irrespective of reliability and probative value. The opposite was the case.*

*Perales,* 402 U.S. at 407–08 (emphasis added). The Court makes plain that its paradigm for evaluating hearsay evidence is not based on its hearsay nature, but rather on the inherent reliability of the hearsay evidence.[6]

---

[6] Even the *Folding Furniture* court made clear that it was not relying on a single sentence in *Consolidated Edison Co. v. National Labor Relations Board,* 305 U.S. 197 (1938). The court stated:

> Hearsay may doubtless be received, if corroborative of other evidence *or otherwise of such nature as to have some reasonable bearing on a fact for determination.* Letters and documents from a party may be received without authentication such as is necessary in courts. *But nonlegal evidence to be admissible must have some substantial probative force and not be a mere opinion except in fields where the opinion of experts is proper for consideration and the person giving it is shown to have some special knowledge reasonably entitling his opinion to some weight.*

195

¶ 193. Unable to ignore this express language in *Perales,* the majority is forced to admit that *"Perales* casts doubt on the continued viability of *Consolidated Edison."* Majority op., ¶ 64. Yet the majority persists that "many states continue to operate under rules that function like the legal residuum rule." Majority op., ¶ 62. The majority punctuates its analysis with a substantial footnote purporting to show the vast number of jurisdictions that do not follow *Perales. Majority op.,* ¶ 62 n.76. Close inspection of the material therein reveals that much of it does not support the majority's conclusion.[7] The majority later admits that "some cases

---

*Folding Furniture Works, Inc. v. Wisconsin Labor Relations Bd.,* 232 Wis. 170, 188, 285 N.W. 851 (1939) (emphasis added).

[7] For example, the majority cites an Alabama Administrative Code provision: "Hearsay is not sufficient to prove any material fact" *unless that hearsay would be admissible under a court-recognized exception.* Ala. Admin. Code r. 482-1-065-.04(9)(b) (2004) (emphasis added). The medical reports at issue here *are* admissible under a court recognized exception. *See* Wis. Stat. § 908.03(6m). Therefore, the Alabama Administrative Code provision cited by the majority actually contradicts its conclusion. The same analysis applies to the Minnesota rule cited by the majority: "Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but is not sufficient in itself to support a finding *unless it would be admissible over objection in civil actions."* Minn. R. 5601.3145(3) (2003) (emphasis added). Medical records that comply with Wis. Stat. § 908.03(6m) are "admissible" over objection in civil actions. The Montana Rule provides that "Hearsay evidence may be received and considered to supplement other evidence, but such hearsay evidence may not be considered to support a finding *unless it would otherwise be admissible over objection in civil actions or under the Montana Rules of Evidence."* Mont. Admin. R. 2-4-604(4) (2004) (emphasis added). Likewise, the Utah rule provides that "Hearsay

196

and . . . some commentators" support the opposing position as advanced by the court of appeals. Majority op., ¶ 85. Notably, most of the authority that favors the court of appeals' *Perales*-based result is more recently

evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding *unless it would be admissible in a judicial proceeding.*" Utah Admin. Code 51–2-12(C) (emphasis added). Finally, the majority cites the Wisconsin Administrative Code: "Hearsay evidence is admissible if it has reasonable probative value but no issue may be decided solely on hearsay evidence *unless the hearsay evidence is admissible under ch. 908, Stats.*" Wis. Admin. Code § DWD 140.16 (emphasis added). In all of these states, medical records *are* admissible under the hearsay rules. *See Ex Parte American Color Graphics, Inc.,* 838 So. 2d 385, 388 (Ala. 2002) (Ala. R. Evid. § 803(6) allows admission of hearsay medical records unless prepared exclusively in anticipation of litigation); *State v. Dick,* 419 N.W.2d 828, 831 (Minn. Ct. App. 1988) (Medical records are considered reliable and are specifically excluded from the hearsay rule by Minn. R. Evid. § 803(4)); *Mason v. Ditzel,* 842 P.2d 707, 713 (Mont. 1992) (Medical records made by examining physician are excepted from the hearsay rule by Mont. R. Evid. § 803(4)); Utah R. Evid. 803(4); Wis. Stat. § 908.03(6m).

The majority believes that the admissibility of the evidence under the evidentiary code "confuses" the issue. Majority op., ¶ 89. Yet that is exactly the standard espoused in many of the codes the majority cites in support of its view.

As for the cases the majority cites in footnote 76, only one of them—*Libby, McNeill & Libby v. Alaska Industrial Board,* 12 Alaska 584 (1950)—concerns medical records. The Alaska court in that case did not have the benefit of the Supreme Court's reasoning in *Perales* because *Libby* was decided in 1950—more than 20 years before *Perales.*

In summary, little of the authority in footnote 76 controverts the fundamental premise of *Perales*—that hearsay medical reports, because of their inherently reliable nature, may constitute substantial evidence in administrative proceedings.

197

minted than the authority favoring the majority's approach. *Compare* majority op., ¶ 85 n.89 (all cases cited are 1998 or newer) with majority op., ¶ 62 n.76 (all cases cited are 1986 or older).

¶ 194. Even the majority's preferred *Consolidated Edison* test only restricts reliance on "uncorroborated hearsay." Here, there is evidence in the record to corroborate the medical reports. The Board's "Finding of Fact #7" states that Gehin participated in a job-retraining program through the State of Wisconsin Division of Vocational Rehabilitation. Her duties included "typing on both a typewriter and a computer, filing, answering the telephone, and other clerical duties."

¶ 195. Gehin's participation within the job retraining program shows that she was not "totally disabled" within the meaning of the ICI contract, thereby corroborating the hearsay medical records. The majority has recited that definition in full, majority op., ¶ 14 n.18, including the language *"complete inability* by reason of any medically determinable, physical or mental impairment, *to engage in any substantial gainful activity"* (emphasis added). Suffice to say that Gehin was not "totally disabled" within the meaning of the ICI contract if she was capable of earning an amount at least equal to her ICI benefit. *Id.* Gehin's monthly ICI benefit was $979.37. *Id.* If, as the Board found, Gehin was capable of working a minimum of 24 hours per week for four weeks each month, she could work a minimum of approximately 96 hours each month. The Wisconsin Department of Workforce Development maintains average salary statistics for a myriad of professions in Wisconsin, broken down by job title and

by locality.[8] In Madison, "secretaries" now earn an average of $14.17 per hour.[9] If Gehin had worked 96 hours at $3.50 per hour less than that rate, she would have earned in excess of her monthly ICI benefit of $979.37. This factual finding by the Board corroborates the conclusion that Gehin was not totally disabled as expressed in the medical reports. The majority disregards this evidence, instead finding that "if the uncorroborated written hearsay medical reports are eliminated from consideration, *no evidence exists* in the record to support the [Board's] findings" about the claimant's physical condition. Majority op., ¶ 47 (emphasis added).

¶ 196. The majority's opinion helps the claimant in this case. But in many future cases, the shoe will be on the other foot. The court's decision will force financially struggling claimants to pay the bills for expert testimony. The majority recognizes this concern. Majority op., ¶¶ 102–03. The majority claims that its decision should not be read to require corroboration by nonhearsay evidence in all instances. Majority op., ¶ 103; *but see* majority op., ¶ 81 ("[U]ncorroborated hearsay alone does not constitute substantial evidence in administrative hearings."). The majority suggests that the parties may stipulate to some or all of the facts or to the submission of and reliance upon the contents of written hearsay reports. Majority op., ¶ 104. The majority also suggests that the parties may stipulate that the agency may base its findings of fact on uncorroborated hearsay. *Id.*

___

[8] *See* Wisconsin Department of Workforce Development Occupational Employment Statistics Survey, *available at www.dwd.state.wi.us/oea/wages.htm* (Nov. 2003).

[9] *Id.*

¶ 197. It should be obvious that when a claimant decides against appealing a decision based on adverse medical reports, the claimant willingly or unwillingly accepts the judgment in the reports. The issue at hand arises when a claimant does not accept the judgment in one or more medical reports, or when a respondent party does not accept the conclusion in a claimant's medical reports.

¶ 198. As the majority recognizes, many claimants in proceedings before the Board are not attorneys. *See* majority op., ¶ 90. Non-attorneys might understandably be suspicious of their adversaries in such administrative proceedings and probably would not be willing to stipulate. When claimants are represented by attorneys, the point is more pronounced: what attorney worth her salt will stipulate to a fact against the interest of her client? Thus, both parties and attorneys will likely press the other side to bring in the doctors for presentation of live testimony, as this court in essence requires today.

¶ 199. The court's decision may even lead to the perverse result that a government agency might refuse to quickly dispose of a claim in which it knows the claimant's position has merit. For instance, the Department of Employee Trust Funds could decide to force the claimant to provide live testimony to corroborate her doctor's records when it knows that the claimant's financial resources are thin. Conversely, claimants in similar positions might decide not to contest termination of benefits because they know they cannot afford the live expert testimony that the majority today demands.

¶ 200. The *Perales* case does not authorize administrative agencies to make factual findings based solely on hearsay *irrespective* of the nature or reliability or

probative value of the hearsay. The *Perales* case recognizes that *some* uncorroborated hearsay constitutes substantial evidence in an administrative proceeding because of its reliability and probative worth *and* because of the opportunity a party has to subpoena a witness for cross-examination. Medical records are widely regarded as reliable, probative, and worthy of acceptance. If uncorroborated medical records do not constitute substantial evidence, then, arguably, *no* uncorroborated hearsay records or statements constitute substantial evidence. This is the staggering consequence of the majority's decision.

¶ 201. In the future, participants in administrative hearings will be required to provide live, in-person testimony to corroborate reliable hearsay evidence. Wisconsin Stat. § 908.03(24) allows the admission of all hearsay statements having "comparable circumstantial guarantees of trustworthiness." "Comparable" presumably means "comparable" to the other 23 exceptions enumerated in Wis. Stat. § 908.03. Yet under the majority's rule, none of these trustworthy pieces of evidence may serve as the basis for an administrative agency's finding without corroboration. Business records, birth certificates, property deeds—none of these commonly-relied upon documents constitutes substantial evidence under the majority's approach without sufficient corroborating non-hearsay evidence.

¶ 202. Wisconsin Stat. § 908.03(6m)(b) specifically provides that in the case of medical records, an authentication witness is unnecessary as long as copies of the records have been served upon opposing parties at least 40 days before trial. This is another indication of our common-sense conviction of the inherent trustworthiness and integrity of medical records. The majority opinion is inconsistent with this conviction.

¶ 203. The majority admits that medical reports are "generally" reliable, but discounts the reliability of Dr. Whiffen's evaluation without explicitly explaining why. Majority op., ¶ 91. Presumably, the majority is referring to Dr. Whiffen's "Attending Physician's Statement" on which Dr. Whiffen initially checked both "yes" and "no" in response to Question 5(a) on the form, which inquires whether the patient is "totally disabled." *See* majority op., ¶ 74. The majority fails to note that question 5(a) is actually divided into two parts: first, inquiring whether the patient is totally disabled as that definition applies to the "Patient's Job," and, second, inquiring whether the patient is totally disabled as to "Any Other Work." Even if Dr. Whiffen's answer to the first part of the question is debatable, his response to the second part is not. Dr. Whiffen clearly checked the "no" box, indicating that in his professional opinion, Gehin was *not* "totally disabled" such that she could not undertake "Any Other Work." The clarity of Dr. Whiffen's response to the second part of the question undercuts the majority's conclusion that the allegedly questionable marking renders his report "not reliable as a basis for the [Board's] findings of fact . . . [or] conclusions of law." Majority op., ¶ 79.

III

¶ 204. The majority opinion disregards the established procedures of the Group Insurance Board. Gehin's case was reviewed first by the United Wisconsin Group, then by the Department of Employee Trust Funds. Gehin *appealed* to the Group Insurance Board,

making the Department the opposing party.[10] In that appeal, *Gehin* had the burden of proof to show that she was entitled to the previously denied benefit. Wis. Admin. Code § ETF 11.03(8). On appeal, Gehin did not object to the admission of the medical reports[11] or to the Department's reliance on the reports. Before the Board issued its final decision, it issued a proposed decision, as it is required to do by rule. Wis. Admin. Code § ETF 11.09(1).

¶ 205. The majority admits that "Arguably the claimant had an opportunity to object to the Findings of Fact being based on uncorroborated hearsay evidence when the Proposed Findings of Fact and Conclusions of Law were released." Majority op., ¶ 107. Actually, Gehin's chance to object was more than "arguable." By rule, when the Board issues its proposed decision, the losing party (Gehin) has 20 days to file an objection to the proposed decision. Wis. Admin. Code § ETF 11.09(3). Gehin, represented by counsel, filed a 23–page written objection to the Board's proposed decision. However, Gehin's objection was not to the Board's reliance on the medical reports. On the contrary, Gehin *relied on the reports* to attempt to show that the Board's

---

[10] *See* Wis. Admin. Code § ETF 11.02(3) (" 'Appeal' means the review of a determination made by the department . . . under s. 40.03(1)(j), (6)(i), (7)(f), or (8)(f), Stats." This appeal was pursuant to Wis. Stat. § 40.03(6)(i) ("[The Board] may accept timely appeals of determinations made by the department affecting any right or benefit under any group insurance plan provided for under this chapter.")); *see also* Wis. Admin. Code § ETF 11.03(7)(a) ("The department shall be a party to each appeal of a determination made by the department.").

[11] Wis. Admin. Code § ETF 11.06(2) provides that "Failure of a party to object on the record to admission of any evidence shall be deemed a waiver of that objection."

Proposed Decision that she was not "totally disabled" was factually incorrect. Gehin failed to object to the Board's reliance on the reports despite the ETF code provision that "The aggrieved party shall specify, in detail . . . each provision of the proposed decision to which the party objects and the basis for each objection . . . [including] each change the party requests the board to make in the proposed decision and the legal grounds for the change." Wis. Admin. Code § ETF 11.09(3)(a)-(b).

¶ 206. The majority skates over the Board's argument that Gehin waived any right to challenge the Board's reliance on the medical reports because she raised no objections on those grounds despite the noted multiple opportunities to do so. Perplexingly, the majority relies on the circuit court's ruling that Gehin "was not required to object and that the claimant therefore did not waive her objections," majority op., ¶ 107, despite its earlier correct statement that "This court reviews the decision of the Group Insurance Board, not the circuit court's order or court of appeals' decision." Majority op., ¶ 5. The majority concludes that it "need not decide whether the claimant waived her right in the present case to challenge the bases of the Findings of Fact." Majority op., ¶ 109. The majority cites no authority that allows it to completely fail to address the Board's argument. In fact, the majority provides no reason at all why Gehin has not waived her arguments as to the Board's reliance on the medical reports.

¶ 207. Instead, the majority simply asserts that the Board's *Perales*-based argument would constitute "abandon[ing] the rule long used in this state that uncorroborated hearsay evidence alone does not constitute substantial evidence." Majority op., ¶ 8. The majority terms its rule "long used," yet United Wisconsin

204

Group, the Department of Employee Trust Funds, the Group Insurance Board, and the court of appeals all operated under the impression that the applicable "rules" allowed the Board to rely on the medical reports.[12] It is the majority that is changing the rules. At a minimum, the majority should remand this case to the Board to allow it to reconsider the case in light of the "residuum rule" standard the majority resurrects.

## CONCLUSION

¶ 208. Professor Kenneth Davis has written that the reasons supporting abandonment of the residuum rule are "overwhelming—so overwhelming as to give rise to the question whether courts that have given lip service to the residuum rule have done so on the basis of misunderstanding instead of through an exercise of informed judgment." Kenneth Davis, 3 *Administrative Law Treatise,* § 16.6 at 239 (2d ed. 1980). Apparently the majority is not "overwhelmed" by the courts' and scholars' criticisms of the residuum rule. I am persuaded and would affirm the decision of the court of appeals relying on the reasoning of *Perales.* I would adopt the rule that hearsay evidence may constitute substantial evidence in administrative proceedings if the hearsay evidence bears inherent guarantees of reliability and trustworthiness and the opposing party has full notice of the evidence and the opportunity to challenge it by subpoenaing a witness. In addition, I believe this court should be more attentive to the waiver issue and the procedures employed by adminis-

---

[12] Wis. Admin. Code § 11.12(2) sets out the "Standards" the Board uses to make findings. Section (2)(a) allows the Board to base its findings on "evidence in the record which proves the findings to a reasonable certainty by the greater weight of the credible evidence." Hearsay is not excluded.

trative agencies in general, and the Board in particular. For the foregoing reasons, I respectfully dissent.

¶ 209. I am authorized to state that Justice JON P. WILCOX joins this dissent.

¶ 210. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The court reviews whether the Wisconsin Group Insurance Board (Board) erred in making a decision that was dependent on a finding of fact supported by written hearsay evidence, namely, reports made by medical doctors. My colleagues' majority and dissenting opinions debate whether such hearsay, if uncorroborated, constitutes "substantial evidence" under Wis. Stat. § 227.57(6). I write separately in dissent because I would not reach the question of whether uncorroborated hearsay constitutes substantial evidence as the hearsay evidence here was corroborated and constituted "substantial evidence" under § 227.57(6). Accordingly, I would affirm the court of appeals.

## I. BACKGROUND

¶ 211. On May 15, 1992, LuAnn Gehin (Gehin) injured her back while working for the University of Wisconsin Hospital. She qualified for Income Continuation Insurance (ICI) benefits, effective June 2, 1993. In a letter dated May 5, 1997, United Wisconsin Group (UWG) informed Gehin that she was not eligible for benefits beyond April 30, 1997 because she no longer met the criteria for "Totally Disabled" under the ICI contract. Pursuant to 5.15–4.b. of the ICI contract, "Totally Disabled" means:

> After the first 12 months, the EMPLOYE's complete inability by reason of any medically determinable,

physical or mental impairment, to engage in any substantial gainful activity for which the EMPLOYE is reasonably qualified with due regard to the EMPLOYE's education, training, experience, and prior economic status. An activity is considered a substantial gainful activity if the earnings from that activity would be at least equal to the gross Income Continuation benefit for the same period of time.

At the time her benefits were terminated, Gehin was receiving $979.34 per month in gross ICI benefits.

¶ 212. Upon Gehin's request, UWG reconsidered and upheld its determination, and then the Department of Employee Trust Funds (DETF) reviewed and affirmed UWG. Gehin subsequently appealed to the Board.

¶ 213. The Board held an evidentiary hearing on October 2, 2001. Gehin, a physician expert retained by Gehin, and a DETF employee gave testimony. Gehin testified that she was not able to work due to pain. She also testified about her participation in a job-training program through the Department of Health and Family Services that included unpaid, on-the-job work experience at Mendota Mental Health Institute (MMHI) from the fall of 1994 until the spring of 1997.

¶ 214. The hearing officer also admitted a number of exhibits, including documents created by health care professionals who did not testify at the hearing, some of which were favorable to Gehin's position and others which were favorable to UWG's determination. Among these exhibits were medical opinions and evaluations prepared by Dr. John Whiffen, Gehin's treating physician, and by Dr. Richard Lemon, an independent medical consultant retained by UWG, neither of whom testified at the hearing.

¶ 215. On April 16, 2002, the Board issued its final decision and order, concluding, "[T]he appellant was not disabled within the requirements of the ICI contract after April 30, 1997." In its Findings of Fact, the Board included statements made by Dr. Whiffen and Dr. Lemon that concluded that Gehin could work with restrictions. The Board relied on these written medical opinions in reaching its conclusion. The Board explained that "UWG and the DETF reasonably accepted the opinions of appellant's treating physician and of UWG's expert" over evidence presented that was favorable to Gehin.

## II. CORROBORATION OF HEARSAY EVIDENCE

¶ 216. Pursuant to Wis. Stat. § 227.57(6), which governs the scope of review of this agency decision, a court "shall . . . set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by *substantial evidence* in the record."[1] Section 227.57(6) (emphasis added). "The test for substantial evidence is whether reasonable minds could reach the same conclusion as the agency, given the evidence in the record." *Hutchinson Tech., Inc. v. LIRC,* 2004 WI 90, ¶ 21, 273 Wis. 2d 394, 682 N.W.2d 343.

---

[1] Wisconsin Stat. § 227.57(6) states:

> If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record.

¶ 217. Some of our cases have called into question whether hearsay evidence[2] that is uncorroborated may, by itself, constitute "substantial evidence" under Wis. Stat. § 227.57(6). *See Folding Furniture Works, Inc. v. WLRB,* 232 Wis. 170, 189, 285 N.W. 851 (1939); *Village of Menomonee Falls v. DNR,* 140 Wis. 2d 579, 610, 412 N.W.2d 505 (Ct. App. 1987); *see also* Wis. Admin. Code § ETF 11.12(2)(b) (providing that in a final decision of the Board, "No finding of fact may be based upon hearsay.")[3] As a general matter, hearsay evidence is considered suspect because of concern regarding its reliability. *See* 29 Am. Jur. 2d Evidence § 658. As the very definition of hearsay makes clear, the problem with relying on a hearsay statement is that the hearsay statement may not be true. *See* Wis. Stat. § 908.01(3) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

¶ 218. The use of hearsay evidence often requires corroboration to insure its reliability. *See Florida v. J.L.,* 529 U.S. 266, 270 (2000). In determining how much and what type of evidence is sufficient for corroboration, we have held evidence is sufficient to corroborate if it "permit[s] a reasonable person to con-

---

[2] Hearsay evidence is admissible. *See* Wis. Stat. § 227.45(1) (providing that "an agency or hearing examiner shall not be bound by common law or statutory rules of evidence"). The issue here is what role hearsay evidence can play in establishing substantial evidence.

[3] The majority opinion interprets this rule as proscribing only hearsay that is not corroborated, and it uses Mr. Miller's hearsay report in its opinion after asserting that it is corroborated. Majority op., ¶ 34.

clude, in light of all the facts and circumstances, that the statement could be true." *State v. Guerard,* 2004 WI 85, ¶ 5, 273 Wis. 2d 250, 682 N.W.2d 12 (citation omitted).[4] This is the appropriate corroboration standard to apply here because if the hearsay statement could be true, reasonable minds could rely on it as substantial evidence. *See Hutchinson Tech.,* 273 Wis. 2d 394, ¶ 21.

¶ 219. This test for corroboration is flexible, as it "neither prescribes nor limits the type or source of acceptable corroboration." *See Guerard,* 273 Wis. 2d 250, ¶ 32. Corroboration is sufficient if it makes a fact reasonably "debatable." *See id.,* ¶ 33. Additionally, there may be a "conflict between two distinct points of view" or the relevant evidence may "point[] in different directions," neither of which defeats corroboration. *See id.* And finally, corroboration does not have to be made by an independent source. *See id.,* ¶ 34. Certain evidence can be self-corroborating.[5] *See id.*

¶ 220. In the present case, the majority asserts that the written report of Dr. Whiffen, who has treated Gehin since 1993, and the written report of an independent medical evaluation performed by Dr. Lemon in

---

[4] *State v. Guerard,* 2004 WI 85, 273 Wis. 2d 250, 682 N.W.2d 12, is based on an interpretation of Wis. Stat. § 908.045(4) and the types of corroboration sufficient to permit the admission of hearsay statements under that section of the statutes, in the face of in-court testimony by the victim. *See also Schipper v. Schipper,* 46 Wis. 2d 303, 174 N.W.2d 474 (1970) (discussing the corroboration that was once required in order to find grounds for divorce), *overruled in part on other grounds by O'Connor v. O'Connor,* 48 Wis. 2d 535, 180 N.W.2d 735 (1970).

[5] In *Guerard,* it was explained that when facts are repeated in substantially the same form, self-corroboration may occur. *Guerard,* 273 Wis. 2d 250, ¶ 34.

1997 are uncorroborated hearsay statements. Statements from these reports, which the Board relied upon in reaching its conclusion, were included in the Board's Findings of Fact:

> 10. .... On January 30, 1997, UWG asked Dr. Whiffen to provide an update as to Gehin's condition. Dr. Whiffen opined on February 7, 1997, that Gehin could work up to full-time with restrictions, including a need to change position every 45–60 minutes for five minutes. On March 11, 1997, Dr. Whiffen stated that Gehin could return to her former job, with restrictions.

> 11. Dr. Lemon examined Gehin on December 3, 1997. UWG provided him with the contractual definition for long-term benefits. Dr. Lemon concluded that Gehin did not meet the contractual long-term benefit definition stating:

> > Because of [low back pain] symptoms I believe that Ms. Gehin needs to be under permanent work restrictions. I believe that she is capable of working 8 hours a day where she can alternate between sitting and standing every 30 minutes. I believe that she needs to be lifting no more than 5 pounds. She also needs to avoid any stooping, bending or twisting. I believe that Ms. Gehin could easily be employed in a position such as a receptionist where she is able to stand or sit using a telephone headset for comfort. Certainly, Ms. Gehin could also do some light paperwork or computer work. I find it hard to believe that Ms. Gehin at only 53 years of age is totally unemployable.

¶ 221. While both doctors' reports are hearsay, they are not uncorroborated. First, Dr. Whiffen had reported that Gehin was able to work prior to the January 30, 1997 and February 7, 1997 reports relied upon by the Board. In a report dated December 9, 1994, Dr. Whiffen first opined that Gehin was able to return

to work as of "3/24/94," with no hourly restrictions but with weight, lifting and bending restrictions. He repeated that opinion in a report dated November 27, 1996.

¶ 222. Further, the record is replete with medical records in addition to the reports of Drs. Whiffen and Lemon. One such report is that of Dr. Kenneth Redlin, dated September 17, 1997. Dr. Redlin related that an August 12, 1997 Functional Capacity Evaluation (FCE) indicated Gehin has an "inability to squat, lift, stand, walk or carry anything but negligible loads," but he noted that Gehin had just returned from a camping trip where she traveled by camper. He opined that the FCE's "spinal evaluation was <u>NOT VALID</u>." (Emphasis in original.) He further noted that an independent medical exam done in 1994 did not indicate employment limitations. From this, he concluded that the FCE done on August 12, 1997 may not be reliable, and he recommended a new independent medical examination.

¶ 223. The reports of Dr. Whiffen, Dr. Lemon and Dr. Redlin corroborate one another under the standards we set in *Guerard* because they show that the opinions in each report "could be true." *Guerard,* 273 Wis. 2d 250, ¶ 5. First, the records from Dr. Whiffen date back to 1992; he was her treating physician. Second, all three doctors focus on Gehin's complaints about back pain and conclude that she could work, notwithstanding her complaints. Third, Dr. Lemon's report is written in response to a request that he render his opinion of Gehin's condition in light of the definition of "totally disabled" in the ICI contract, which definition is given to him and forms the framework for his opinion. And fourth, the reports of Drs. Whiffen and Lemon are self-corroborating, as well as corroborating each other. They were prepared independently, but they repeat the

212

same medical facts and draw the same conclusion about Gehin's claimed total disability. *See id.,* ¶ 34.

¶ 224. Furthermore, Gehin, herself, testified sufficient to show that the opinions of Drs. Whiffen and Lemon could be true, in that she testified about her on-the-job training program at MMHI. She said that she was able to perform clerical tasks, such as typing, working on a computer, sorting mail, filing, and running errands, as well as receptionist duties, using a headset that allowed to her stand and walk while she answered the phone. She testified that she regularly took rests while doing these tasks. .

¶ 225. Gehin explained that she missed a certain number of days of this on-the-job training or left early, in part due to pain, but also because she was attending classes at a local technical college, had foot surgery and a hysterectomy, and had "allergenic" episodes. A letter from Gehin's supervisor stated that she generally worked 24–30 hours a week. However, the record also includes a handwritten statement signed by Gehin relating that she "leave[s] for on the job training at 7:15 a.m. till 4:30 Monday thru Friday at MMHI rest when I get home." That is a full-time work schedule.

¶ 226. The majority opinion does not evaluate the facts of record in regard to the question of corroboration, nor does it apply any standard for determining whether the reports that the Board relied on were corroborated. It simply ducks the issue by *assuming* that the reports were uncorroborated. Majority op., ¶ 3.[6] It also makes multiple conclusory statements that the reports of Drs. Whiffen and Lemon were not cor-

---

[6] The majority opinion states, "The following issue is presented: Does uncorroborated written hearsay evidence alone (that is controverted by in-person testimony) constitute substantial evidence to support the Group Insurance Board's fac-

roborated. *See e.g.,* majority op., ¶¶ 8, 45, 47, 48. However, a lack of corroboration cannot be assumed because corroboration is an issue in this case.

¶ 227. Additionally, the reports at issue are opinions of expert witnesses, which we have recognized as being different from other types of hearsay, in regard to their reliability. As we explained in *Folding Furniture,*

> Hearsay may doubtless be received, if corroborative of other evidence or otherwise of such nature as to have some reasonable bearing on a fact for determination. . . . [N]on-legal evidence to be admissible must have some substantial probative force and not be a mere opinion *except in fields where the opinion of experts is proper for consideration and the person giving it is shown to have some special knowledge reasonably entitling his opinion to some weight.*

*Folding Furniture,* 232 Wis. at 188 (emphasis added). Accordingly, for the reasons I have set out above, I conclude that reasonable minds could reach the conclusion that Gehin was not "totally disabled" as defined in the ICI contract in reliance on the opinions and evaluations of Dr. Whiffen and Dr. Lemon. In my view, those opinions and evaluations constitute "substantial evidence" under Wis. Stat. § 227.57(6) because they are corroborated and are reliable evidence in their own right.

---

tual findings, which in turn form the basis for its conclusion of law, *i.e.,* that the claimant's benefits should be terminated as of April 30, 1997?"

## III. CONCLUSION

¶ 228. In sum, I would not reach the question of whether uncorroborated hearsay constitutes substantial evidence because the hearsay evidence here was corroborated and constituted "substantial evidence" under Wis. Stat. § 227.57(6).

¶ 229. Therefore, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.

¶ 230. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this dissent.